**DIEBOLD, INCORPORATED, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 374–83T.

United States Claims Court.

Jan. 18, 1989.

**194**

Lyman G. Friedman, Washington, D.C., Atty. of Record, for plaintiff.

Stuart J. Bassin, Atty. of Record, Charles Bricken, former Atty. of Record, Washington, D.C., with whom was Asst. Atty. Gen. William S. Rose, for defendant.

## OPINION

RADER, Judge.

■ In this tax refund action, the plaintiff, Diebold, Inc. (Diebold), seeks a refund of federal income taxes in the amounts of $454,261 for taxable year 1976 and $350,-509 for taxable year 1977. The plaintiff claims that, in those years, it was entitled to both a deduction for depreciation and an investment tax credit on replacement parts for automatic electronic banking units. The plaintiff maintained these parts in a service pool and only placed them in service when necessary to replace a defective part in a customer's automatic banking unit. From 1976 through 1979, the plaintiff accounted for these parts as inventory on its tax returns. The cost of goods in inventory cannot generally be deducted until those goods are sold or are no longer serviceable. At that point, the cost of producing the inventory goods is written off against the gross income derived from sales. *Commissioner v. Van Raden*, 650 F.2d 1046 (9th Cir.1981).

In 1980, the plaintiff filed amended returns that accounted for the replacement parts as depreciable capital assets. By treating them as capital assets, the plaintiff could deduct the cost of producing the parts ratably over their entire useful life. Moreover, the plaintiff could claim an investment tax credit. The difference between inventory treatment and capital asset treatment of the parts is represented by the amounts the plaintiff claims as a refund in this suit.

Based on these same undisputed facts, the defendant has filed for summary judgment. The defendant contends that the Internal Revenue Code requires a taxpayer to secure the Commissioner's consent prior to changing from one accounting method to another. Internal Revenue Code, 26 U.S.C. § 446(e) (1982 & Supp. IV 1986). Because the plaintiff failed to secure the Commissioner's consent prior to changing accounting methods, the defendant contends that it is entitled to judgment as a matter of law.

After argument, this court grants the motion of the United States. Accordingly, the complaint is to be dismissed.

## FACTS

Unless otherwise noted, the following facts are undisputed. The plaintiff, Diebold, Inc., (Diebold), is an accrual-basis taxpayer whose primary business is marketing bank security systems. In the early 1970's, Diebold entered the automated teller machine (ATM) market. At first, the plaintiff sold an ATM assembled from com-

ponent parts purchased from other manufacturers. Later Diebold began to develop its own more sophisticated teller machines.

The plaintiff designed and built an "A" series ATM in 1974. After refinements, Diebold began to market a "B" series ATM. Both of these early series were prone to malfunction. However, series "C," which Diebold began to produce in July 1975, was a considerable improvement. Accordingly, the plaintiff's sales increased.

Diebold designed and built the new series "C" ATMs in modular form. Each machine comprised separate subassemblies (modules) to perform distinct functions, such as reading magnetic cards, accepting deposits, dispensing cash, printing receipts, or transmitting customer commands.

Diebold's innovative modular system facilitated immediate on-site repair of a malfunctioning machine. To restore ATM service as quickly as possible, Diebold's service personnel carried spare replacement modules when making a service call. If unable to repair a disabled machine in a few minutes, the plaintiff's service personnel simply replaced the faulty part with a spare module from the service pool. With a functional module in place and service restored, Diebold shipped the faulty module to a central repair facility. After repair, the rehabilitated module was returned to the service pool for use as a replacement part in another malfunctioning ATM. These service modules were "rotated" in the sense that malfunctioning parts were repaired and returned to the pool of spare replacement parts. The plaintiff's pool of service modules, though constantly rotating, remained fairly constant in size.

In 1975, Diebold decided to convert the unreliable "A" and "B" model ATMs that had been previously installed in customer premises into functional "C" units. The plaintiff hoped thereby to improve customer relations, enhance marketing, and reduce service costs. In 1975, the plaintiff converted 58 of its 88 "A" and "B" units into reliable "C" units. Throughout this period, the retrofitting or conversion operation was entirely separate from the service

rotation program. The plaintiff estimated that the cost of completing the conversion in 1976 would be $687,300 and included that amount in its 1975 tax return as a cost of goods sold.

Meanwhile the plaintiff deducted (in 1974 and 1975), as start-up costs, the engineering expenses attributable to development of "C" model hardware. The plaintiff claimed that these research and development (R & D) expenses totalled $306,400 in 1974 and $413,600 in 1975.

The Internal Revenue Service (IRS or Service) audited Diebold's 1974 and 1975 returns, ultimately challenging the plaintiff's 1975 deduction for conversion costs actually incurred in 1976. The IRS also disallowed Diebold's 1974 and 1975 deductions for engineering expenses, contending that those expenditures created an intangible asset amortizable over five years. The plaintiff maintained that the 1976 conversion costs were properly accrued in 1975 and that the engineering costs of developing "C" model hardware were deductible as an R & D expense.

On December 6, 1979, the plaintiff and the IRS settled this dispute. Under the settlement agreement, Diebold was permitted to deduct one-half of the 1976 conversion costs in 1975 (and the other half in 1976), but was required to depreciate the engineering costs according to the IRS proposal. The settlement agreement terminated the controversy over Diebold's tax treatment of the retrofitting program.

Although the rotation and retrofitting programs employed entirely separate accounting and management systems, these negotiations over treatment of retrofitting modules suggested to Diebold the benefits of a different tax treatment for rotating service modules. As early as 1974, Diebold accounted for the spare service modules as nondepreciable inventory in both tax returns and financial reports. Diebold clearly adopted this inventory accounting treatment in its tax returns for the years 1976, 1977, 1978, and 1979. The settlement negotiations on retrofitting modules, which concluded in December 1979, made evident to

Diebold the benefits of depreciating the rotating service modules.

Diebold's original Form 1120 (Corporation Income Tax Return) for 1976 was filed on June 15, 1977. The return showed a tax due of $5,404,013, which the plaintiff immediately paid. Diebold's 1976 return did not claim any investment tax credit for the costs ($3,069,327) of manufacturing rotatable service modules. Nor did the plaintiff claim any depreciation. Instead, Diebold accounted for the spare modules as nondepreciable property without a determinable life. Hence, the plaintiff counted receipts from its service contracts as income and deducted the cost of providing service.

Plaintiff filed its original 1977 return on June 15, 1978, and paid the $3,545,343 reported due. As in 1976, the plaintiff treated replacement modules as inventory. The plaintiff claimed no depreciation for service modules in its original 1977 tax return.

In the wake of the retrofitting module settlement, Diebold began to list these replacement modules as depreciable assets in its 1980 return and in financial statements. On October 6, 1980, plaintiff filed amended returns for the years 1976, 1977, 1978, and 1979. In the amended returns, Diebold changed its tax accounting treatment of spare service modules from inventory to depreciable property eligible for the investment tax credit. Accordingly, Diebold claimed a refund for 1976 of $454,261 and for 1977 of $350,509. At the time it filed these amended returns, Diebold's 1976 and 1977 returns were being audited by the IRS.

The Service on April 18, 1983 disallowed plaintiff's 1976 and 1977 refund claims, maintaining that Diebold was not entitled to change unilaterally its method of accounting. After Diebold treated spare parts as inventory for several years, the Service asserted that Diebold was required to secure the consent of the Commissioner of Internal Revenue (Commissioner) prior

to changing accounting methods. The plaintiff did not file Form 3115 (request for Commissioner's consent to change accounting method) prior to attempting to amend its returns and apparently has not filed such form to date.

Each of the plaintiff's amended returns (1976, 1977, 1978, and 1979) and refund claims was based upon a change in accounting method, effected in 1980 and beginning with the amended return for 1976. For reasons that remain unclear, the Service acted upon plaintiff's 1979 amended return and refund request prior to those for 1976, 1977, and 1978. Diebold's Form 1120X (Amended Corporate Tax Return) for 1979 stated that the "change in the deductions was due to an error." The amended 1979 return did not disclose that plaintiff had originally treated its spare parts, in respect to which it now claimed deductions and credits, as inventory. Like the first 1976 and 1977 returns, Diebold's original return for 1979 claimed no depreciation deductions or investment tax credit with respect to spare service parts.[1]

On February 2, 1981, two years before disallowing the plaintiff's 1976 and 1977 claims, the IRS sent Diebold notice that its refund for 1979 had been allowed in the amount of $775,269. On April 18, 1983, defendant denied the 1976 and 1977 claims. On September 13, 1984, the Service issued a 30-day letter denying Diebold's 1979 refund. The Service apparently has not yet taken action on plaintiff's 1978 amended return.

The plaintiff filed its complaint in this court challenging the Service's April 18, 1983, disallowance of the refunds requested for tax years 1976 and 1977.

## DISCUSSION

Pursuant to RUSCC 56(b), the United States moves for summary judgment asserting the absence of any genuine issue of material fact and claiming entitlement to

---

**1.** The parties stipulate that the original returns for 1976, 1977, and 1978 had not claimed these deductions and credits because the plaintiff treated spare modules as inventory. The parties also stipulate that the plaintiff's 1976, 1977, and 1978 amended returns were identical in pertinent part to the amended return for 1979. None of the amended returns disclosed the change of accounting treatment.

judgment as a matter of law. Summary judgment is an integral part of the rules of this court which are designed "to secure the just, speedy, and inexpensive determination of every action." RUSCC 1(a)(1); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). RUSCC 56 enables the court to dispose efficiently of cases as a matter of law when no material controversy of fact remains. Thus, the rule permits the court to streamline the judicial process by isolating and disposing of factually unsupported claims or defenses. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553–54.

To attain these judicial economies, the rule allows the court to pierce the factual allegations in the pleadings and reach a legal resolution when more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the legal result. *Pure Gold v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984).

▮ In this case, the factual evidence contained in the oral and written presentations of the parties was considered under the standards enunciated in *Adickes v. Kress*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed. 2d 142 (1970), and *Celotex*. These cases establish the burdens to be borne by the movant and opponent of a summary judgment motion. *Adickes* governs the movant's obligations under the summary judgment rule. A movant for summary judgment has the "burden of showing the absence of a genuine issue as to any material fact...." *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608. The subsequent *Celotex* decision, however, clarifies that the *Adickes* rule does not require the movant to produce evidence showing the absence of a genuine issue of material fact with respect to an issue on which the nonmoving party bears the burden of proof. In such a case, the movant's burden may be discharged by demonstrating an absence of evidence to support the nonmoving party's case.

*Celotex* obliges a party to "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322, 106 S.Ct. at 2552. Thus, a complete failure of proof concerning an essential element of the nonmoving party's case entitles the moving party to judgment as a matter of law. *Id.* at 323, 106 S.Ct. at 2553.

*United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), provides instruction concerning the weight to be given the presentations of each party: "On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *Id.* at 655, 82 S.Ct. at 994. When evaluating the merits of the motions, the court must resolve reasonable factual disputes against the movant. *Schwabenbauer v. Board of Education*, 667 F.2d 305, 313–14 (2d Cir.1981). Mere denials or conclusory statements, however, are not sufficient to create an evidentiary conflict. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984).

▮ A material fact is one which will make a difference in the result of a case. *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Substantive law provides the basis to identify the material facts. Only disputes over facts that might affect the outcome of the suit will properly preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## I. *Consent requirements*

Defendant has moved for summary judgment asserting that plaintiff attempted to "change its method of accounting for certain rotatable spare service parts without having properly requested or obtained the consent of the Commissioner." Def's Brief filed March 17, 1987, at 1. The uncontroverted facts, construed to resolve doubts in favor of the plaintiff, indicate that Diebold changed from an inventory accounting method for spare service modules to a depreciation method without obtaining the required consent.

The Internal Revenue Code sets forth the consent requirement governing changes in accounting method:

*Requirement Respecting Change of Accounting Method.—*

Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

26 U.S.C. § 446(e).

Treasury Regulations further clarify the foregoing Code requirements:

(e) *Requirement respecting the adoption or change of accounting method.* (1) a taxpayer filing his first return may adopt any permissible method of accounting in computing taxable income for the taxable year covered by such return....

(2)(i) Except as otherwise expressly provided in chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. *Consent must be secured whether or not such method is proper or is permitted* under the Internal Revenue Code or the regulations thereunder.

(ii)(a) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions *or a change in the treatment of any material item used in such overall plan.* Although a method of accounting may exist under this definition without the necessity of a pattern of consistent treatment of an item, in most instances a method of accounting is not established for an item without such consistent treatment. *A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction.* Changes in method of accounting include a change from the cash receipts and disbursement method to an accrual method, or vice versa, a change involving the method or basis used in the valuation of inventories (see sections 471 and 472 and the regulations thereunder)....

(3)(i) Except as otherwise provided under the authority of subdivision (ii) of this subparagraph, in order to secure the Commissioner's consent to a change of taxpayer's method of accounting, *the taxpayer must file an application on form 3115....*

26 C.F.R. § 1.446–1(e) (1988) (emphasis added).

Thus, to briefly restate the requirements of the statute as interpreted by the regulations, taxpayer intending to change any method of regularly computing income on any material item must first obtain the consent of the Secretary of Treasury. A material item, according to the regulations, is any item involving the timing of computing income or deductions.

The Court of Claims applied this rule in a 1965 case where the taxpayer attempted to switch from a strict cash basis of accounting to a hybrid of accrual and cash basis accounting:

The possibility that taxpayers might wish to change their systems of accounting from time to time was contemplated, and a procedure whereby such changes might be effected was prescribed....

....

Therefore, if the plaintiff desired to change its treatment ... the plaintiff had the privilege of applying to the Commissioner of Internal Revenue for permission to make such a change....

....

The reason for the exercise of such discretionary power by the Commissioner was that a change in the method of reporting an important item of expense or of income would almost certainly result in some distortion of net income ... and it was incumbent upon the Commissioner to see that such distortion was not unduly detrimental to the revenue of the Government.

*Hackensack Water Co. v. United States,* 173 Ct.Cl. 606, 612–13, 352 F.2d 807 (1965).

As a matter of uncontroverted fact, Diebold did consistently account, over a period of at least four years (tax years 1976–79), for its replacement modules as inventory. In 1980, the plaintiff sought by amended return to treat the modules instead as noninventory depreciable assets eligible for the investment tax credit. A "change," from inventory to depreciation treatment constituted a "change in the method of accounting" within the meaning of the Code and the Treasury Regulations. This term, according to Treasury Regulations, is defined as "a change in the treatment of any material item." A "material item," in turn, is defined as "any item which involves the proper time for the ... taking of a deduction." 26 C.F.R. § 1.446(e)(2)(ii)(a).

In this case, the plaintiff's attempt to claim depreciation (over a five-year useful life) on rotatable spare parts involves the proper time for the taking of a deduction. Diebold initially treated its spare modules as inventory, a method that permits the cost of acquiring inventory to be deducted in a single year.[2] Diebold's amended returns, in contrast, seek to recover the cost of the spares ratably over their useful life. See 26 U.S.C. § 167. By plaintiff's own figures, the accounting treatment it proposes by amended return would generate $9,110,913 more in deductions (all at an earlier time) than would its original (inventory) treatment, for the period 1976–1982 alone.

According to applicable law, as well, the plaintiff's amended return involves the proper time for the taking of a deduction. See, e.g., Southern Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 680–83 (1980), supp. op. 82 T.C. 122 (1984) (change in depreciating certain assets affected time of deduction and was change of accounting method); Hooker Industries, Inc. v. Commissioner, T.C. Memo. (P–H) ¶ 82,357, at 1546–47 (1982) (change from deducting cost of inventory at time of use to deducting inventory at time of purchase was a materi-

al item). These cases establish that changes within inventory or depreciation techniques, let alone a change from inventory to depreciation, involve the timing of deductions.

Because shifting from inventory to depreciation clearly involves the proper time for the taking of a deduction—a point which the plaintiff virtually concedes, Pl. Findings at ¶¶ 30, 31, 40, 56—Diebold's amended return changed accounting methods for a "material item." Therefore, the threshold requirements for the application of the consent rule have been satisfied. Witte v. Commissioner, 513 F.2d 391, 393 (D.C.Cir.1975).

Thus, § 446(e) requires the Commissioner's consent prior to such a change, and 26 C.F.R. § 1.446–1(e)(3)(ii) prescribes the method for securing that consent. The plaintiff admits that it did not file an application for consent on Form 3115 as the regulation requires. Declaration of Lyman Freidman, February 20, 1987, Def. Br. filed March 17, 1987, App. C, at A–165. (Bricken Declaration). The requirement of Form 3115 is also established by case law. See, e.g., Southern Pac. Transp., 75 T.C. at 682; Casey v. Commissioner, 38 T.C. 357, 385–86 (1962); Advertisers Exchange, Inc. v. Commissioner, 25 T.C. 1086, 1093 (1956), aff'd per curiam, 240 F.2d 958 (2d Cir. 1957).

While not contesting these material facts, the plaintiff opposes the defendant's summary judgment motion on three alternative grounds. First, Diebold argues that the Commissioner's approval was not required. The plaintiff makes three alternative contentions in support of this argument: (1) Its conduct fits within an exception in § 446(e) because the plaintiff merely corrected an accounting error; (2) § 446(e) does not govern because the plaintiff had not "regularly" used its original accounting method; and (3) its amended returns do not interfere with the purposes underlying the consent rule of § 446(e). Second, Diebold

**2.** Inventory accounting normally requires inclusion of the cost of additions to inventory during a given year in the cost of opening inventory. Deducting the cost of closing inventory from this figure yields the cost of goods sold. Such cost is deducted from gross revenues from sales to compute gross profits.

argues that even if consent was required it was, directly or indirectly, granted. Third, Diebold takes the position that, if neither of the arguments above prevail, there are still substantial unresolved issues of material fact requiring full evidentiary hearings.

## II. *Not a correction, but a change*

The plaintiff first contends that its amended return treatment of spare parts fits within an exception to the § 446(e) regulation, which states that "[a] change in method of accounting does not include correction of mathematical or posting errors...." 26 C.F.R. § 1.446.1(e)(2)(ii)(b). Diebold maintains that its amended return corrected an "erroneous application of the inventory method of accounting" and consequently did not require consent. Pl.Br. filed May 29, 1987, at 26. This argument fails because the plaintiff changed methods of accounting, rather than simply correcting the "mathematics or posting" of its original accounting system. In other words, the plaintiff would be allowed, without securing IRS approval, to correct mathematical or posting errors in the figures generated by its original inventory accounting method. Instead, the plaintiff changed from inventory accounting to depreciation accounting—a change which involved the timing of deductions. By definition, this change required consent.

The regulations also highlight the distinction between corrections and changes by clarifying that "a change in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for ... the taking of a deduction." 26 C.F.R. 1.446-1(e)(2)(ii)(b). If, therefore, the plaintiff's amended return merely corrected or adjusted items which did not involve deduction

timing, consent would not be required. Diebold's 1980 attempt to amend the 1976 and 1977 returns, however, drastically altered deduction timing.

Construing the facts favorably to the plaintiff, Diebold in 1980 proposed to change from an incorrect accounting method to a correct accounting method without obtaining consent.[3] Correcting an error in the selection of accounting methods, however, is not exempted from the consent requirement. In the first place, the words of the Tax Code state clearly that *"[e]xcept as otherwise expressly provided in this chapter,* a taxpayer who changes the method of accounting ... shall ... secure the consent of the Secretary." 26 § U.S.C. 446(e) (emphasis added). Thus, Congress provided that the only exceptions to the consent rule would be expressly stated in the Code.[4] The effect of this statutory language, therefore, is to make any change in accounting method, except those specifically excluded by statute or regulation, comply with the prior consent rule.

Moreover, the language of the applicable regulation is unequivocal: "[c]onsent [to change methods] must be secured *whether or not* such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder." 26 C.F.R. § 1.446-1(e)(2)(i) (emphasis added). The examples given in the regulation further illustrate that consent is required even where the taxpayer changes from an incorrect method to a correct one. 26 C.F.R. § 1.446-1(e)(2)(iii) examples 6–8.

Most federal courts faced with the question have enforced the consent rule without taking into consideration the correctness of the original method. The Court of Claims has enforced the consent rule despite the

---

**3.** Defendant does not concede that the plaintiff's original inventory treatment, although not as beneficial to the plaintiff, was incorrect. In argument counsel for the defendant clarified the Government's position:

> THE COURT: ... if I understand you correctly, you do feel these rotatable modules are appropriately classified as inventory and not depreciable assets.
> MR. BASSIN: Right.

**4.** The exceptions clause in § 446 is found in subsection (b). *See infra* note 6 and accompanying text. This exception governs instances when the taxpayer has not regularly used a method of accounting or has not used a method clearly reflective of income. In those instances, the general rule permitting use of the taxpayer's regular accounting method is replaced with a provision allowing the Secretary to select a method that does reflect income. 26 U.S.C. § 446(b).

taxpayer's desire to change from an incorrect to a correct method of accounting. *Ed Smithback Publishing, Inc. v. United States,* 37 A.F.T.R.2d 76–486, 76–495 (1975) (decision of Trial Judge Lydon), *adopted mem.,* 209 Ct.Cl. 743, 538 F.2d 347 (1976). Similarly, the United States Court of Appeals for the D.C. Circuit ruled that "[t]he danger of distortion of income detrimental to governmental revenues exists regardless of whether the change in method is from one proper method to another or from an improper method to a proper one." *Witte,* 513 F.2d at 394. In addition to the Court of Claims and the District of Columbia Circuit, the consent requirement has been applied regardless of the taxpayer's desire to correct methods by the Second Circuit, *American Can Co. v. Commissioner,* 317 F.2d 604, 606 (2d Cir.1963) *cert. denied,* 375 U.S. 993, 84 S.Ct. 632, 11 L.Ed.2d 479 (1964); the Third Circuit, *Commissioner v. O Liquidating Corp.,* 292 F.2d 225 (3d Cir.), *cert. denied,* 368 U.S. 898, 82 S.Ct. 177, 7 L.Ed.2d 94 (1961); *Poorbaugh v. United States,* 423 F.2d 157, 163 (3d Cir. 1970); the Fourth Circuit, *Broida, Stone & Thomas, Inc. v. United States,* 204 F.Supp. 841, 843 (N.D. W.Va.), *aff'd per curiam,* 309 F.2d 486 (4th Cir.1962); the Fifth Circuit, *Wright Contracting Co. v. Commissioner,* 316 F.2d 249 (5th Cir.1963), *cert. denied,* 375 U.S. 879, 84 S.Ct. 147, 11 L.Ed. 2d 110 (1963); and the Ninth Circuit, *United States v. Kleifgen,* 557 F.2d 1293, 1297 n. 9 (9th Cir.1977).

One circuit court opinion appears to take a contrary position. In 1955, the Tenth Circuit held that "a taxpayer may, without the consent of the Commissioner, apply the method of accounting which he has adopted, though not theretofore applied to a particular item, when that change will correct errors and clearly reflect his income." *Beacon Pub. Co. v. Commissioner,* 218 F.2d 697, 702 (10th Cir.1955). This single divergence from the general rule is explained, however, by the statutory history of § 446(e). *Beacon* was decided under the predecessor to § 446 of the 1954 Tax Code, § 41 of the 1939 Code. Section 41 stated:

> The net income shall be computed ... in accordance with the method of accounting regularly employed in keeping the books of said taxpayer; but if no such method of accounting has been so employed, or *if the method employed does not clearly reflect the income,* the computation shall be made in accordance with such method as in the opinion of the Commissioner does *clearly reflect the income.*[5]

Act of May 28, 1938, ch. 289 § 41, 52 Stat. 473 (current version at 26 U.S.C. § 446) (emphasis added).

The Tenth Circuit explained that "[t]he obvious purpose of these provisions is to obtain from the taxpayer a return reflecting its true income and to treat income received and deductible disbursements consistently." *Beacon,* 218 F.2d at 699. Accordingly, the Tenth Circuit ruled that taxpayer's change in methods accurately reflected his income despite the Commissioner's contrary opinion. Thus, § 41 of the 1939 Code contained no express prior consent rule. Instead, net income was to be computed according to a method that, in the Commissioner's opinion, clearly reflected income. The 1939 provision demanded no prior consent and placed particular emphasis on establishing a method that accurately reflected income. *Id.* at 701–02.

The 1954 revision of the Tax Code changed the legal focus of this section. In the event of a change in accounting methods, the 1954 Code established a prior consent requirement. The correctness of the original return, which governed consideration of changes in accounting methods un-

---

5. This language may be traced back to § 212 of the Act of 1918. W.E. Barton & C.W. Browning, 1 *Barton's Federal Tax Laws Correlated* 72 (1925). Prior to the 1918 amendment, the comparable section read:

> An Individual keeping accounts upon any basis other than that of actual receipts and disbursements, unless such other basis does not clearly reflect his income, may, subject to regulations made by the Commissioner of Internal Revenue, with the approval of the Secretary of Treasury, make his return upon the basis upon which his accounts are kept.... *Id.* at 73.

der the 1939 Code, became in 1954 an exception to § 446.[6] Under the 1954 Code, federal courts have consistently required accounting method changes to meet the prior consent requirement without regard to which method more accurately reflects the taxpayer's income. *See, e.g., Witte,* 513 F.2d at 394; *American Can,* 317 F.2d at 606.

The legislative history accompanying enactment of § 446(e) further confirms Congress's intent to require the Commissioner's consent for any changes regardless of which method correctly reflects the taxpayer's income. Identical language in the House and Senate Reports accompanying the Internal Revenue Code of 1954 indicates that "[s]ubsection (e) codifies existing regulations." H.R.Rep. No. 1337, 83d Cong., 2d Sess. A158 (1954); S.Rep. No. 1622, 83d Cong., 2d Sess. 300 (1954), U.S. Code Cong. & Admin.News 1954, pp. 4017, 4629. *Beacon,* which ruled against requiring the Commissioner's consent, construed the pre–1954 regulations to state that a taxpayer "cannot change its system of accounting without the consent of the Commissioner. Treasury Regulations 111, Sec. 29.41–2." *Beacon,* 218 F.2d at 701. Thus, the regulations rejected by *Beacon* and later codified by § 446(e) required consent regardless of whether a taxpayer proposed changing to a method that more accurately reflected its income.[7] In light of the changes enacted in the Internal Revenue Code of 1954, *Beacon* helps clarify that the Commissioner's consent is required for all changes in accounting methods, including

"corrections" intended to more accurately reflect a taxpayer's true income. In sum, the 1954 Act created a prior consent requirement for changes in accounting method, which has since been repeatedly upheld.

Other language in the House and Senate Reports accompanying the Internal Revenue Code of 1954 conveys the same meaning. Both reports state: "In computing taxable income, a taxpayer who changes his general method of accounting or who treats material items inconsistently must obtain the consent of the Secretary or his delegate unless an express provision of this chapter permits such a change at the election of the taxpayer without consent." H.R.Rep. No. 1337, 83d Cong., 2d Sess. at A158 (1954); S.Rep. No. 1622, 83d Cong., 2d Sess. at 300–01 (1954). Thus, the reports accompanying H.R. 8300 clarified that any change in "material items ... must obtain the consent of the Secretary." *Id.* The reports included in this class any "change in the method of depreciating *any* property." *Id.* (emphasis added).

Thus, the language of § 446(e), the regulations clarifying § 446(e), the case law interpreting § 446(e) in six circuits, the statutory history of § 446(e) and its predecessors in earlier versions of the Code, as well as the legislative history accompanying § 446(e)'s enactment, separately and cumulatively establish that a taxpayer may not change from an incorrect to a correct accounting method without the Commissioner's consent. Regardless of the correctness of the original or the proposed new

6. Under the 1954 Code, the language from the 1939 Code concerning reflection of income was moved into § 446(b):

(a) *General rule* Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) *Exceptions* If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

26 U.S.C. § 446(a) and (b).

The plaintiff makes no written or oral contention that its conduct fits within the exception clause found in § 446(b). Instead, the plaintiff

contends that consent under § 446(e) was either unnecessary or already granted.

Under the 1954 Code, the Commissioner's discretion, under § 446(b), to require a taxpayer to employ a method more reflective of actual income will only be set aside by courts in instances of clear abuse. *Cole v. C.I.R.,* 586 F.2d 747 (9th Cir.) *cert. denied,* 441 U.S. 924, 99 S.Ct. 2034, 60 L.Ed.2d 398 (1978).

7. This court does not mean to suggest that § 446(e) was enacted specifically to overturn the *Beacon* decision. *Beacon* was decided on January 3, 1955, months after the enactment of H.R. 8300. This court cites *Beacon* to illustrate the Tenth Circuit's view of the law prior to enactment of H.R. 8300, which altered the requirements for changes in accounting methods.

method, the taxpayer may not, under the 1954 Code, make the change without the Commissioner's consent.

In attempting to fit within the narrow correction exception for mathematical or technical errors within an original method of accounting, Diebold relies principally upon three cases—one a decision of this court's predecessor. In *Gimbel Brothers, Inc. v. United States*, 210 Ct.Cl. 17, 535 F.2d 14, *later proceeding*, 211 Ct.Cl. 383 (1976), the taxpayer elected under § 44(a) of the 1939 Code (and § 453(a) of the 1954 Code) to report income from its department store sales on the installment method. At the same time, Gimbel Brothers reported one subclass of these sales, revolving credit plan sales, under a different and erroneous accrual method.

Upon discovering the error, Gimbel Brothers maintained that its election of the installment method in 1952 covered all its installment sales income, including that from revolving credit plan sales. Because it had deviated from its elected method, Gimbel Brothers sought to correct the error in applying its elected method, *not* to change its election. In short, Gimbel Brothers misapplied its validly elected method with respect to revolving credit sales, and the Court of Claims required correction of the error.

In contrast, Diebold selected at the outset no accounting method other than inventory for service modules. Nor does the plaintiff seek to correct an error in applying the inventory accounting method. Instead, the plaintiff attempts to change from an inventory method to a depreciation method. *Gimbel Brothers*, therefore, is inapposite.

The second case, *Thompson–King–Tate, Inc. v. United States*, 296 F.2d 290 (6th Cir.1961), is inapposite for the same reason. In *Thompson–King–Tate*, the taxpayer erroneously applied its completed contract method of accounting by reporting income in its 1953 and 1954 returns that should have been properly reported in 1955. The

Sixth Circuit held that plaintiff could correct the error in applying its properly adopted method without the Commissioner's consent. Again, the plaintiff in *Thompson–King–Tate* did not vary from its original method of accounting.

Diebold also relies on *Amling–De Vor Nurseries v. United States*, 139 F.Supp. 303, 304 (N.D. Cal.1956), in an effort to fit within the very narrow correction exception to the consent rule. *Amling–De Vor*, however, did not apply the consent requirement at all. Instead, the IRS opposed the plaintiff's amended returns on the ground that original returns were correct and required no correction. Like *Beacon*, *Amling–De Vor* concerned tax years prior to 1954 that were governed by § 41 of the 1939 Code. Accordingly, the correctness of the original returns was appropriately the central focus of the case.[8] Under current law and regulations, this distinction is no longer material to the outcome of this case. Section 446(e) now requires consent to change accounting methods regardless of whether the original method election was correct. 26 C.F.R. § 1.446–1(e)(2)(i)(a). Because the correction doctrine under § 41 of the 1939 Code is very different from the current correction exception under Treasury regulations, the *Amling–De Vor* decision does not support the plaintiff's effort to fit within the narrow regulatory exception.

Finally, plaintiff in its supplementary brief, cites *dictum* from *First National Bank of Gainesville v. Commissioner*, 88 T.C. 1069 (1987), for the proposition that it was not required to file Form 3115 to request consent for "correction" of its "error." Plaintiff's reliance again is misplaced.

In *Gainesville*, the plaintiff bank was a transferee of Hall Paving, a mining business. In 1976, Hall began to include soil aggregate in inventory at an erroneously overvalued rate of $1 per ton. Although it validly changed in 1977 to the LIFO inventory method—which requires inventory to be valued at cost—the mining business

---

8. Admitting that plaintiff's computations "present[ed] a muddy and unclear picture" of which method was in fact employed, the court

in *Amling–De Vor*, nevertheless granted judgment for plaintiff on its refund claims. 139 F.Supp. at 304.

nevertheless maintained the erroneous valuation for soil aggregate until 1978. In 1979, the business attempted to decrease the value assigned to the soil aggregate to $.10 per ton. Although this transaction appears to be the permissible correction of a valuation error under an unchanged accounting method [9], the Tax Court held that the write-down constituted a change of accounting method without the Commissioner's consent.

The court also suggested in passing, however, that Hall might have corrected the 1976 error, among other ways, by filing an amended return for 1976 and subsequent years. The court's suggestion in *dicta* was presumably based on the perception that Hall had made an error in applying its existing inventory accounting method, that is, a permissible valuation error. In any event, the United States Tax Court was clearly aware that correction of an erroneous method of valuing inventory is a change of accounting method. *See Primo Pants Co. v. Commissioner*, 78 T.C. 705 (1982); *Fruehauf Trailer Corp. v. Commissioner*, 42 T.C. 83 (1964), *aff'd* 356 F.2d 975 (6th Cir.), *cert. denied*, 385 U.S. 822, 87 S.Ct. 51, 17 L.Ed.2d 60 (1966). This is evident from the Tax Court's holding in *Gainesville:* "Though the write-down of soil aggregate in 1979 may have constituted the correction of an error, it also constituted a change of accounting method pursuant to section 472(e). Where the correction of an error results in a change in accounting method, *the requirements of section 446(e) are applicable.*" 88 T.C. at 557 (emphasis added).

Accordingly, *Gainesville* is properly cited for the proposition that the correction of an error that constitutes a change of accounting method requires the Commission-

er's consent. The taxpayer in *Gainesville* did not seek, as the plaintiff does, to have its product treated retroactively as noninventory depreciable assets. *Gainesville* and the other cases plaintiff cites hold that taxpayers may, without consent, correct *mere errors* in applying original accounting methods. In other words, a taxpayer may make, without obtaining consent, corrections that do not amount to changes of accounting method. Thus, these cases do not apply to the plaintiff's proposed change which clearly affects deduction timing.

In sum, construing this correction argument to resolve all possible doubts in Diebold's favor, the defendant is nevertheless entitled to judgment as a matter of law. Although only allegedly seeking to correct an error, the plaintiff must still obtain the Commissioner's consent if correction of that error results in a change of accounting method. Because its amended return changed the timing of when the plaintiff would deduct the cost of the service modules, Diebold is correcting its error by changing accounting methods. Therefore, the plaintiff cannot make the correction without consent under § 446(e).

III. *"Regularly" requirement*

The Tax Code requires a taxpayer to secure the Commissioner's consent to any change in accounting method "on the basis of which he *regularly* computes his income." 26 U.S.C. § 446(e). Diebold's second challenge to the defendant's summary judgment motion is that it did not regularly employ inventory accounting treatment. The plaintiff instead contends that the first year (1976) in which it sought to depreciate its spare parts as capital assets is currently before the court.

Diebold relies primarily on *Silver Queen Motel v. Commissioner*, 55 T.C. 1101

---

9. This court's predecessor has recognized that an error in valuation within an original and unchanged accounting method may be corrected without securing consent. *Korn Industries, Inc. v. United States,* 209 Ct.Cl. 559, 532 F.2d 1352 (1976). The IRS, however, does not acquiesce in the *Korn Industries* holding. Rev. Rul. 77–134, 1977–1 C.B. 132, holds instead that any attempt to revise an erroneous computation that has extended over a period of years constitutes a change in accounting methods (because

the adjustment involves deduction or income timing). The Ruling also stands for the broader proposition that "if a taxpayer has consistently treated an item of income or expense in a particular manner, any change from that consistent treatment is a change of accounting method regardless of whether the consistent treatment was a proper method of accounting." Rev.Rul. 80–190, 1980–2 C.B. 161, 162. This court, however, follows the ruling in *Korn Industries.*

(1971), for the proposition that a taxpayer may correct an accounting error in its first year without consent. Accordingly, the plaintiff asserts that correcting its choice of method for the first year the method was employed establishes that it had not regularly used the method in the intervening four years. To the contrary, undisputed facts indicate that Diebold's 1980 amendments attempted to change an accounting method for spare parts which plaintiff had treated as inventory at least from 1976 through 1979—a period sufficient to constitute regular usage under § 446(e).[10]

The plaintiff's attempt to avoid its regular treatment of spare modules as inventory is unavailing. *Silver Queen*, contrary to the plaintiff's contention, does not represent the proposition that a taxpayer may change its accounting method unilaterally as long as the proposed change reaches all the way back to the first year of the original method. In *Silver Queen*, the IRS disallowed the taxpayer's use of an impermissible method of depreciation in the taxpayer's first year of existence. Then the Service sought to impose straight-line depreciation on the taxpayer. The Tax Court agreed with the taxpayer that it should be allowed to change to the permissible 150% declining balance method without consent because the taxpayer was only in its first year and had not "regularly" used the impermissible method (double declining balance).

*Silver Queen* is distinguishable from this case on several grounds. First, uncontroverted facts show that the plaintiff used inventory treatment regularly from at least 1976 until 1979. Unlike Diebold, the *Silver Queen* was in its first tax year and had not even filed a second tax return, let alone established a regular method of accounting. Second, unlike *Silver Queen*, the Service has not disallowed the plaintiff's regular method. Instead, the plaintiff desires to change unilaterally its regularly established, and presumably acceptable, method of inventory accounting. The IRS ordered the *Silver Queen* to change methods and then attempted to deny consent to the Motel's alternative method. Diebold, on the other hand, is not compelled to make a change and has not sought consent for its preferred alternative. Third, Diebold did not employ an alternative method of depreciation in its original returns, as did the Silver Queen Motel, but instead employed solely inventory treatment. Choosing between depreciation methods at the outset of a taxable venture is different from changing methods four years later.

Most significantly, Diebold, unlike the Silver Queen Motel, is not in its first year of existence. Whereas the Silver Queen Motel was able to change methods in its first year before establishing a regular accounting pattern, Diebold had a long established and regular pattern which it desired to change retroactively. The facts of *Silver Queen* are significantly different from the facts now before this court.[11]

---

**10.** A taxpayer engaging in a new line of business may adopt an accounting method for that activity by using it in the first return in which income from that activity is reported. 26 C.F.R. § 1.446–1(e)(1). In its original 1976 return, Diebold treated service modules as inventory. If Diebold's use of modules in 1976 was in fact a new business, the plaintiff adopted inventory treatment as its method of accounting when it filed its original 1976 return.

The plaintiff, having used a method in its first return covering the activity, was bound to follow that method consistently thereafter. The regulations state: "(d) *Taxpayer engaged in more than one business.* (1) ... The method *first* used in accounting for business income and deductions in connection with each trade or business, as evidenced in the taxpayer's income tax return in which such income or deductions

are *first* reported, *must be consistently followed thereafter.*" 26 C.F.R. § 1.446–1(d)(1) (emphasis added).

Moreover, the plaintiff employed inventory accounting from 1976 until 1980. Accordingly, even drawing all reasonable inferences against the movant, the facts indicate that the plaintiff "regularly" used inventory treatment as its method of accounting for spare service modules.

**11.** For the same reason, other cases applying reasoning similar to that of *Silver Queen* are not persuasive. Both *Mamula v. Commissioner,* 346 F.2d 1016 (9th Cir.1965), and *Maid–Rite Steak Co. v. United States,* 643 F.Supp. 1162 (M.D.Pa. 1986), turn on the IRS rejection of an improper method in the first return covering the activity. Here the plaintiff seeks to make the change

The plaintiff also misplaces its reliance on *Foley v. Commissioner,* 56 T.C. 765 (1971). In *Foley,* the taxpayer purchased eighteen used vehicles in 1964. In his original return, Foley depreciated sixteen of the vehicles under the impermissible double-declining balance method (as in *Silver Queen*). Foley used straight-line depreciation for the other two. Later in the same year, Foley sought, in an amended 1964 return filed before his 1965 return, to depreciate all eighteen vehicles using the 150% declining balance method. As in *Silver Queen,* the Commissioner disallowed the changes for both the sixteen and the two vehicles. The IRS preferred to impose straight-line depreciation on all of the transactions. Accordingly, the IRS argued that the plaintiff could not change his permissible straight-line method of accounting for the two vehicles without securing consent. Although Foley had amended his return before filing a return for the next year, the Commissioner relied on the consent requirement.

The United States Tax Court invoked *Silver Queen* for the proposition that the plaintiff may change an impermissible accounting method—the scheme used for the sixteen vehicles—without the Commissioner's consent.[12] Because the taxpayer had elected a permissible method for the two vehicles, the court disallowed any change without the Commissioner's consent. The consent rule was thus strictly enforced even though Foley had filed an amended return in the first year prior to any returns for future years.[13]

*Foley* is of no assistance, however, to the plaintiff in this instance. *Foley* involved an instance in which the amended return for the first year of the activity was filed *before* the filing of original returns for

subsequent years. The plaintiff did not file its amended 1976 return until after it had filed initial returns for 1977, 1978, and 1979. In similar circumstances where the taxpayer has clearly adopted a regular method of accounting, the Tax Court, which is otherwise more lenient on the consent rule, requires the Commissioner's permission for a change. *Mitchell v. Commissioner,* 42 T.C. 953, 967–68 (1964); *Casey v. Commissioner,* 38 T.C. 357, 385–86 (1962).

Under the terms of a Revenue Ruling and a General Counsel Memorandum (G.C. M.), the IRS has acquiesced in the *Silver Queen* and *Foley* results where facts crucial to those two decisions are present. Rev.Rul. 72–491, 1972–2 C.B. 104, G.C.M. 38,680 (Apr. 18, 1981). These exceptions to the consent requirement are operative only where the taxpayer uses an erroneous method (of "depreciation" in the Ruling, of "accounting" in the G.C.M.) in the first year of the applicable activity. In these limited cases, the taxpayer may, without seeking consent, change to a correct method of depreciation or accounting for the first year if either: (a) The IRS disallows the use of the erroneous method in that first year (as in *Silver Queen*), or (b) the taxpayer files an amended return, using a correct method, for the first year before filing his return for the following year (as in *Foley*).

The plaintiff does not meet either criterion. The Revenue Ruling allows a taxpayer, in certain specified circumstances, to correct "an erroneous method of depreciation" without consent. The plaintiff, however, clearly seeks to "correct" its treatment of items classified as inventory. Inventory treatment is not a method of depreciation; thus, Diebold had no method of

---

many years after employing an inventory, rather than a depreciation, accounting method.

**12.** As discussed earlier, the prevailing rule among courts of appeal would require a taxpayer to obtain permission for any change of accounting method, regardless of whether the initial method was permissible or impermissible. *See Witte,* 513 F.2d at 391.

**13.** It is well established that, once a taxpayer selects a method of accounting in the first year

of a taxable activity, the Commissioner's consent is required for any change in an amended return filed after the time for filing the initial return has expired. As stated in *Pacific Nat'l Co. v. Welch,* 304 U.S. 191, 194, 58 S.Ct. 857, 858, 82 L.Ed. 1282 (1938), "There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method."

depreciation to correct. Moreover, the plaintiff is not attempting to correct a method rejected by the IRS in the first year before filing a subsequent year's return. The ruling does not apply to the plaintiff.

The G.C.M. applies to liquidations under § 334(b)(2) where the taxpayer, "prior to filing its return for the following tax year," attempts by amended return to correct "the liquidated subsidiary's impermissible method of accounting for items in its inventory." G.C.M. 38,680. In this case, however, the plaintiff filed returns for 1977, 1978, and 1979 before attempting to amend its 1976 return. Thus, the plaintiff does not meet the requirements of G.C.M. 38,-680.

The plaintiff states that it initiated the 1980 amendment to the 1976 and 1977 returns to be consistent with positions taken by the revenue agent in charge of the audits for 1974 and 1975. By this argument, the plaintiff attempts to establish that the 1974 and 1975 audits implicitly disallowed the 1976 inventory method. The audit of the plaintiff's 1974 and 1975 returns focused on conversion modules, not its 1976 treatment of spare service modules. By definition, the revenue agent's comments regarding tax years 1974 and 1975 could not have constituted a disallowance of the plaintiff's 1976 treatment of spare parts, especially if, as Diebold maintains, 1976 was the first year in which it held a pool of rotatable replacement modules.

The plaintiff's argument that the Revenue Ruling is an improper limitation of *Silver Queen* and *Foley*, overlooks the express language of the Tax Code. The statute requires the Commissioner's consent for any change of accounting method unless specifically excepted by the Tax Code. The Commissioner has essentially granted consent in advance in cases presenting the same circumstances as *Silver Queen* or *Foley*. This is not such a case.

Although *Silver Queen* and *Foley* are factually distinguishable from this case, these decisions also represent a legal policy

unique to the United States Tax Court. Unlike several circuit courts, the Tax Court has granted taxpayers leeway to correct impermissible or incorrect accounting methods without securing the Commissioner's consent. This divergence of Tax Court policy was noted in *Southern Pacific Transportation Co. v. Commissioner:*

> On the question of whether consent is necessary to change from a clearly incorrect accounting method, some Courts of Appeals have adopted a fairly strict approach. See, for example, *Witte v. Commissioner*. In each of the appellate decisions cited above, the Court of Appeals held that the consent of the Commissioner is necessary for a change even where the taxpayer's old method is shown to be wrong. This Court has tended not to require consent in such situations.

75 T.C. 497, at 682 n. 208 (citations omitted).

This unique Tax Court policy, however, is not consistent with the language and history of § 446(e) [14] that the language and history is accurately reflected by regulations which specifically require that consent to change an accounting method "must be secured whether or not such method is proper." 26 C.F.R. § 1.446–1(e)(2)(i). This clarification of the stated intent of Congress has, as noted earlier, been upheld by numerous appellate court decisions. *See, e.g., Witte*, 513 F.2d at 394; *Poorbaugh*, 423 F.2d at 163; *Wright Contracting*, 316 F.2d at 249.

Of singular importance, this unique policy of the United States Tax Court does not accurately reflect the law in this circuit. *Hackensack Water*, 352 F.2d at 807; *Ed Smithback Publishing*, 209 Ct.Cl. at 743, 538 F.2d 347. According to the prevailing view, the statute and regulations require the Commissioner's consent even when the change is from an improper method.

IV. *Purpose of consent requirement*

■ The plaintiff posits, as a third reason to avoid § 446(e), that the underlying purposes of the consent requirement will be frustrated by prohibiting a change that

**14.** *See supra* notes 4–5 and accompanying text.

does not require compensating adjustments. The plaintiff seeks again, in essence, to avoid the consent rule because changing from an incorrect to a correct method would accurately reflect its income and require no further adjustments. Although the court, for purposes of this motion, accepts plaintiff's assertion that no adjustments would be necessary, the Internal Revenue Code simply does not condition the consent rule upon a showing that adjustments will be necessary. The Commissioner is charged with the responsibility of ascertaining what adjustments are required when a taxpayer applies for consent to switch methods. Unlike the 1939 Tax Code, however, the need for adjustments is not, under current law, the test for whether the taxpayer must request consent at all. Consent is required except "as otherwise provided" in the statute or regulation. 26 U.S.C. § 446(e).

The policy underlying the consent rule was articulated by the Supreme Court in *Pacific National Co. v. Welch*, 304 U.S. 191, 194, 58 S.Ct. 857, 858, 82 L.Ed. 1282 (1938):

> Change from one method to the other, as petitioner seeks, would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws. It would operate to enlarge the statutory period for filing returns (§ 53(a)) to include the period allowed for recovering overpayments (§ 322(b)). There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method.[15]

The Court of Claims employed similar reasoning in stating the reasons for § 446(e): "The courts have enforced the Commissioner's permission requirement to enable him to protect the fisc most effectively. Any change of accounting method will almost certainly distort net income in the year of change." *Wanamaker Philadelphia, Inc.*

*v. United States*, 175 Ct.Cl. 169, 175, 359 F.2d 437, 440 (1966).

Finally the United States Tax Court has identified several policies served by this section of the Internal Revenue Code: "(1) to protect against the loss of revenue; (2) to prevent administrative burdens and inconvenience in administering the tax law; and (3) to promote consistent accounting practice thereby securing uniformity in the collection of revenue." *Barber v. Commissioner*, 64 T.C. 314, 319–20 (1975) (citations omitted).

According to these decisions, a central policy underlying the consent requirement is that the Commissioner should have an opportunity to review consent requests in advance. With advance notice, the Commissioner has leverage to protect the fisc, to avoid burdensome administrative uncertainties, and to promote accounting uniformity. If taxpayers generally were permitted to change accounting methods unilaterally, the Commissioner would face the enormous administrative burden of detecting changes and reviewing the propriety of each switch without ready leverage to protect the fisc or promote uniformity.

In the absence of the prior consent rule, a taxpayer could adopt a method of accounting and after several years unilaterally switch to an alternative method which hindsight suggests would have been more financially beneficial. Thus, the Commissioner's ability to protect the fisc and prevent unnecessary variations in accounting procedures would be substantially reduced. In order to avoid missing taxable income, the IRS would be required to multiply its detection and examination efforts to prevent abuse of unconsented retroactive changes. The administrative advantages of advance notice are thus integrally linked to the purposes of protecting the fisc and promoting accounting uniformity.

The plaintiff retorts that its switch to a correct accounting procedure will not endanger the fisc or disrupt uniformity. The

---

**15.** Since amendment of the consent requirement in 1954, this passage from *Pacific National*, 304 U.S. at 194, 58 S.Ct. at 858, has been endorsed as an appropriate statement of the reasons for the consent requirement. *Lord v. United States*, 296 F.2d 333, 335 (9th Cir.1961).

D.C. Circuit considered and rejected this argument: "The danger of distortion of income detrimental to governmental revenues exists regardless of whether the change in method is from one proper method to another or from an improper method to a proper one." *Witte*, 513 F.2d at 394.

Moreover, the plaintiff in this case desires to make precisely the kind of change that could undermine the purposes of the prior consent rule. The plaintiff seeks to apply a unilateral change retroactively to cover many past tax years. If taxpayers were permitted to select the accounting method which best reflects their income over the past four years, only those taxpayers gaining a financial advantage from switching methods would seek refunds. Thus, uniformity in accounting would become a function of financial advantage and the administrative difficulties of detecting unwarranted unilateral changes would be multiplied. Moreover, the potential impact on the fisc would be likely to vary unpredictably from year to year. In sum, the purposes and policies underlying the consent requirement are still served when a taxpayer presumes to change unilaterally from an incorrect to a correct procedure.

### V. *Was consent granted?*

The plaintiff argues that even if the proposed change of accounting methods requires consent, the Commissioner has already granted consent. The plaintiff finds this implied consent in the Revenue Agent's Report (RAR) issued after audit of the plaintiff's 1974 and 1975 tax years, in the RAR for 1976 and 1977, and in the payment of a refund on 1979 taxes. For various reasons, none of these events constituted consent, express or implied, sufficient to satisfy § 446(e).

### A. 1974 and 1975 Audit

The plaintiff claims to have already secured consent because the accounting change for spare service modules was initiated by the IRS' examination of plaintiff's "retrofitting" or ATM conversions in years 1974 and 1975. In the 1974 and 1975 audits, the Service and the plaintiff negotiated an agreement under which Diebold would: (a) deduct one-half of the costs of converting "A" and "B" units into "C" units in 1975 and one-half in 1976; and (b) treat R & D costs in developing the "C" model as having created an amortizable intangible asset, as the Service proposed.

The plaintiff contends that this action led its tax manager to believe that the Service had approved treatment of all replacement modules—both rotatable service modules and conversion modules—as noninventory capital assets. Thus, the plaintiff sought by amended returns for 1976 and 1977 to depreciate the service modules to comply with IRS guidance. The plaintiff states that its tax manager's belief that this was the proper treatment was "reconfirmed" by its receipt in February 1981 of a refund check for taxable year 1979. For this reason, "no Form 3115 was filed." Pl.Br. filed May 29, 1987, at 11. The solitary belief of the plaintiff's tax manager is simply not supported by adequate corroborating evidence. Other than the coincidence that both the 1974–75 audit and the 1976 proposed change deal with ATM modules, these two events have very little in common. At issue in the 1974 and 1975 audits was treatment of the costs of converting "B" models to "C" models and R & D expenses. The settlement had nothing whatsoever to do with the plaintiff's accounting treatment for spare service modules. The plaintiff does not present any facts that would give its tax manager a basis for believing the IRS had approved any treatment at all of service modules. Neither the Service's partial allowance of Diebold's 1975 deduction of conversion costs nor the IRS-imposed amortization of R & D expenses could logically have approved any change in spare service module treatment.

Furthermore, the plaintiff maintains that it did not even engage in the activity of using rotatable service modules until 1976. If this is correct, the revenue agent could hardly have proposed to change, in 1974 and 1975, Diebold's accounting treatment

of a non-existent activity.[16] The 1974 and 1975 audit changes, in sum, could not have imposed on plaintiff a method of depreciation for the service modules. The record shows that the audit changes allowed no 1976 depreciation at all.

### B. The 1976 and 1977 Audit

The plaintiff observes that the revenue agent for the 1976–77 audit agreed partially, in proposing audit changes, with its current position that spare modules are noninventory depreciable assets. The plaintiff argues essentially that the revenue agent's position, as set forth in the 1976–77 RAR, constitutes consent to Diebold's proposed 1980 change. The defendant answers that the Commissioner ultimately denied the plaintiff's claims for 1976 and 1977 refunds.

■ According to uncontroverted facts, the Commissioner obviously did not concur in the revenue agent's proposed treatment of Diebold's service modules. In other words, the Commissioner did not "accept" amended returns going back to the "first year" in which plaintiff offered service contracts that included replacement parts at no additional charge. As a matter of law, a revenue agent's initial position, taken prior to final action on a refund claim, does not bind the Commissioner. *See Biewer v. Commissioner,* 341 F.2d 394, 396–97 (6th Cir.1965); *H.F. Campbell Co. v. Commissioner,* 53 T.C. 439, 449–50 (1969), *supplemented,* 54 T.C. 1021 (1970), *aff'd,* 443 F.2d 965 (6th Cir.1971) (revenue agent's recommendations to be viewed as tentative; it was Commissioner's prerogative to reject them). Moreover, § 446(e) requires the Commissioner's final, as op-

posed to an agent's preliminary, consent to a change of accounting method. The Commissioner's 1976–77 audit denied consent to the proposed change of accounting method.

Finally, the RAR for the plaintiff's 1976 and 1977 taxable years is dated August 20, 1981. The plaintiff attempted to change accounting methods in amended returns dated October 6, 1980. The Tax Code requires a taxpayer to obtain the Commissioner's consent prior to changing methods. A revenue agent's remarks subsequent to the change does not constitute a prior approval by the Commissioner, as required by law.

### C. The 1979 Refund

■ In October 1980, plaintiff amended its 1976, 1977, 1978, and 1979 returns to claim depreciation on service modules. In late December 1980 and in February 1981, plaintiff received the refund claimed for 1979. The plaintiff argues that issuance of the refund constituted consent to its use of the (new) accounting method. This consent argument ultimately fails also.

The defendant relies on the September 14, 1987 Declaration of Antoinette M. Cross of the IRS' Cincinnati Tax Accounts Division in stating that payment of the 1979 claim was contrary to IRS procedures and therefore unauthorized. The statements made by Ms. Cross are supported by documentary evidence. The plaintiff fails, by affidavit or otherwise,[17] in any way to take issue with the facts as the defendant presents them.[18]

Regardless of the validity of the procedures recounted by Ms. Cross, however, the refund of the 1979 taxes was issued on

---

**16.** Defendant notes and the court agrees, that the parties' different interpretations of the effect of the RAR does not create a genuine issue of material fact. The contents of the RAR are in the record and not disputed. The court is free, consequently, to find that the revenue agent's proposals (concerning, as they did, conversion and R & D expenses) had nothing to do with Diebold's spare modules (whenever it put them into service). While there is an issue as to *when* Diebold began the activity in question, it is strictly immaterial to whether Diebold obtained consent to change its accounting method.

**17.** The court provided the parties an opportunity to argue the merits of this motion during a status conference on November 17, 1988.

**18.** The essence of the defendant's contention is that because the 1979 refund payment was made in violation of IRS regulations and 26 U.S.C. § 6405, it was unauthorized. The United States is not bound by its agent's unauthorized acts. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Bornstein v. United States,* 170 Ct.Cl. 576, 582, 345 F.2d 558, 562 (1965).

December 23, 1980. The notification of the allowance of the refund was sent by the IRS to the plaintiff on February 2, 1981. The plaintiff had filed its amended 1976 and 1977 returns (Form 1102X) on October 6, 1980. The Service's questioned allowance of the 1979 refund occurred *after* the plaintiff sought to change accounting methods. Section 446(e) of the Internal Revenue Code clearly requires a taxpayer to secure the Commissioner's consent "before computing his taxable income under the new method." 26 U.S.C. § 446(e). Accordingly, the allowance of a refund for 1979 subsequent to the filing of the amended returns, even if construed to constitute a valid consent, would not satisfy the terms of the Code.

For other reasons as well, the 1979 refund did not constitute consent to plaintiff's change in accounting for taxable years 1976 and 1977. The plaintiff's 1979 refund claim did not disclose on its face that it was based on a change of accounting method, but purported merely to correct an error. The 1979 refund was issued prior to examination of the plaintiff's 1979 taxable year and two years before its 1976 and 1977 amended returns were processed. As a result, the agent who processed the 1979 claim was not likely to have known it was based on a change of accounting method. The plaintiff failed to put the agent, and certainly the Commissioner, on notice of the change of method. *See, e.g., Fowler Bros. & Cox v. Commissioner*, 138 F.2d 774, 775–76 (6th Cir.1943) (Commissioner may grant consent informally by accepting amended return that puts him on notice that taxpayer has changed its accounting method); *Falk v. Commissioner*, 37 T.C. 1078, 1085 (1962), *aff'd*, 332 F.2d 922 (5th Cir.1964).

After citing *Fowler Bros.* and other implied consent cases, the Court of Claims suggested in *Ed Smithback Publishing*, that "in those cases [where] the Commis-

sioner was fully aware of the change in accounting methods ... or played some part in initiating said change ...," consent may be implied. 37 A.F.T.R.2d ¶ 76–366, at 496, *adopted*, 209 Ct.Cl. at 743. In contrast, the Commissioner clearly did not initiate the 1979 change and the plaintiff failed to disclose its unilateral accounting method change. The facts indicate that the Commissioner after audit of the 1976 and 1977 years, disallowed the change for 1976 and 1977 and currently proposes to do so for 1978 and 1979.[19] In the absence of adequate notice of the change, the Commissioner cannot be deemed to have "accepted" the amended returns or given consent to a change of method.

### VI. *Distortion of income*

■ The plaintiff seeks to avoid the consent requirement by arguing that retention of its original accounting treatment results in a distortion of its income for the years in question. To avoid "a mismatching of income and deductions," plaintiff argues, a change of accounting method for rotatable service modules should be permitted by this court. Pl.Br. filed May 29, 1987, at 18–19.

For purposes of this motion, the court assumes that treating Diebold's modules as inventory mismatches income and deductions, nonetheless this contention is not sufficient to deny the defendant judgment as a matter of law. Regardless of whether the plaintiff's inventory accounting method distorted income, the plaintiff, by virtue of having used that method regularly in reporting income, at least from 1976 through 1979, was obligated to secure consent prior to making a method change. 26 C.F.R. § 1.446–1(e)(2)(i). If the plaintiff had filed Form 3115 requesting a change in accounting methods, and the Commissioner had then disallowed the change, the plaintiff's distortion of income argument would appropriately raise the question of whether the Commissioner abused his discretion.

---

**19.** Even if the 1979 refund could be construed as consent to a change of method, the court deems that such consent would not operate retroactively to 1976. The regulation suggests that changes of method (and consent) are effective only prospectively. 26 C.F.R.

§ 1.446–1(e)(3)(i) requires filing of Form 3115 *"within 180 days* after the *beginning of the taxable year* in which it is *desired* to make the change"* (emphasis added). Accordingly, such "consent" would be effective, if at all, only from 1979.

*See generally Clement v. United States,* 217 Ct.Cl. 495, 580 F.2d 422 (1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 455 (1979).

The Commissioner has broad discretion to permit or deny a requested change. *Brown v. Helvering,* 291 U.S. 193, 204, 54 S.Ct. 356, 361, 78 L.Ed. 725 (1934); *Southern Pac. Transp.,* 75 T.C. at 681. The failure of the Commissioner to grant permission can successfully be challenged only by a showing that the Commissioner's decision was arbitrary or an abuse of discretion. *Schram v. United States,* 118 F.2d 541, 544 (6th Cir.), *cert. denied,* 314 U.S. 695, 62 S.Ct. 412, 86 L.Ed. 555 (1941); *Casey v. Commissioner,* 38 T.C. 357, 386 (1982) (Acq.); *Advertisers Exchange, Inc. v. Commissioner,* 25 T.C. 1086, 1093 (1956), *aff'd per curiam,* 240 F.2d 958 (2d Cir.1957). As stated in *Southern Pacific,* "[I]t is not sufficient for a taxpayer merely to show the correctness of the new method; that fact alone cannot justify a change without the Commissioner's consent." 75 T.C. at 681; *see Wright Contracting Co. v. Commissioner,* 316 F.2d 249 (5th Cir.1963), *aff'g* 36 T.C. 620 (1961).[20]

Until the plaintiff seeks consent, the Commissioner has exercised no discretion which this court can examine for abuse. The argument that the Commissioner's failure to consent sanctions a distortion of income cannot relieve plaintiff of its statutory obligation to seek the required consent. Until the plaintiff gives the Commissioner an opportunity to consent in the manner provided by law and regulation, i.e., in response to filing of a Form 3115,

the issue of whether its original accounting method distorts income is immaterial.

## VII. *Equal treatment*

The plaintiff contends as well that the Commissioner's position in this case puts it at a competitive disadvantage. The plaintiff states that the Commissioner has permitted other companies such as Memorex Corporation to treat their rotatable spares as depreciable assets. Consequently, the plaintiff argues that it is entitled to prevail in this case under principles of *International Business Machines Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966).

In *IBM,* the computer company sued to recover excise taxes paid on business machines from 1951 through 1958, alleging that the Commissioner had treated its competitor Remington Rand more favorably. Both companies in the years 1951–58 were engaged in the manufacture, sale, and lease of competing computer systems. Prior to 1955, both had paid excise tax on these articles pursuant to I.R.C. § 3406(a)(6) (1939), and its replacement I.R.C. § 4191 (1954). Remington Rand in April 1955 requested and received a ruling that certain of its machines were not subject to the tax.[21] Three months later IBM made a ruling request identical in relevant part to that of Remington Rand; it was denied. The court held that the Commissioner had abused his discretion when he denied IBM's request but made Remington Rand's machines taxable only prospectively from February 1, 1958, while IBM's machines were taxable at all times.

**20.** Where the proposed new method would be more correct than the old, the Commissioner's consent is nonetheless essential. *H.F. Campbell Co. v. Commissioner,* 53 T.C. 439, 448 (1969), *aff'd,* 443 F.2d 965 (6th Cir.1971). While the Tax Court has sometimes not required consent where taxpayer attempts to change from a clearly incorrect accounting method, various courts of appeals have adopted a strict approach, as has the Tax Court on occasion. *See generally supra* p. 206.

The Court of Claims, as stated previously, has required consent even where the taxpayer seeks to change an incorrect method. *See Ed Smithback Publishing,* 37 A.F.T.R.2d at 76–495 (citing

*Witte,* for the proposition that consent is required even if "the change was to correct use of a previous but erroneous method"). This court is bound by Court of Claims precedent. It also believes that the view of the consent requirement adopted in this circuit and at least six others is more in harmony with the language of the Tax Code and the intent of Congress.

**21.** That ruling was revoked in 1957, but only prospectively, about the time IBM's request was denied. Remington Rand machines, accordingly, were exempt from the excise tax from 1955 to 1957. *See* 170 Ct.Cl. at 359–60, 345 F.2d 558.

In this case, however, the plaintiff did not request, in the manner prescribed by 26 C.F.R. § 1.446–1(e)(2)(i), consent to switch methods. Not having a chance to exercise discretion, the Commissioner could not, as in *IBM*, have abused it. The plaintiff concedes that it did not file Form 3115 to request consent to a change of accounting method. Hence, the plaintiff has no basis to assert that such a request was granted to a different taxpayer. *Bornstein*, 170 Ct.Cl. at 585–86, 345 F.2d 558, cites *IBM* for the proposition that since plaintiffs did not request a ruling, and chose instead to rely on a private ruling issued to another corporation, the Commissioner was free to treat plaintiffs differently from taxpayers who had secured rulings, without abusing his discretion.

In addition, *IBM* has been strictly limited to its particular circumstances. *See, e.g., Carpenter v. United States*, 7 Cl.Ct. 732, 739 (1985), *aff'd mem.*, 790 F.2d 91 (Fed. Cir.1986); *Knetsch v. United States*, 172 Ct.Cl. 378, 391 n. 14, 348 F.2d 932, 940 n. 14 (1965), *cert. denied*, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966). In a refund suit, plaintiff has the burden of proving its entitlement to the relief it seeks. *Carpenter*, 7 Cl.Ct. at 739. The mere fact that another taxpayer has been treated differently from the plaintiff does not establish the plaintiff's entitlement.[22] On the facts, defendant is entitled, as a matter of law, to prevail because plaintiff, not having requested consent to change its accounting method, cannot establish that the Commissioner exercised any discretion to be reviewed by this court.

VIII. *Alleged disputes of material fact*

Finally, plaintiff attempts to suggest that material fact disputes persist. However, the facts genuinely in dispute are not material to the disposition of a motion based "solely on plaintiff's attempt to change its method of accounting for certain rotatable spare service parts without hav-

ing properly requested or obtained the consent of the Commissioner." Def.'s Brief filed March 17, 1987, at 1.

The substantive legal question presented in this case is whether taxpayer is entitled by an amended return to change treatment of rotatable spare service parts from inventory to depreciable assets qualifying for an investment tax credit without first obtaining the consent of the Commissioner of Internal Revenue to a change in method of accounting as required by § 446(e).

Because the substantive law of this case involves consent requirements for changes in accounting methods, facts concerning a taxpaying corporation's original methods of accounting, its attempt (if any) to change that treatment, its efforts to procure consent for actual changes, and its eligibility for any exceptions to the consent rule are all material. Thus, several potential disputed issues of fact are not material. For instance, the plaintiff contends, and the IRS disputes, that the spare service modules may only be correctly classified as depreciable property. This dispute is immaterial because the substantive law requires consent regardless of the correctness of the initial accounting method. In addition, the facts establish that the IRS never disallowed the original inventory treatment, thus suggesting that the initial methodology was at least acceptable at the time that the plaintiff made its unilateral switch of methods.

The plaintiff also asserts the existence of a contested issue of material fact as to whether 1974 or 1976 was the first year of inventory treatment. This question, however, can be answered by resort to the plaintiff's own Proposed Findings: "[A]t the introduction of the Tabs 500 to the market in *1974, for* both financial reporting and *tax purposes, plaintiff* erroneously *accounted for its spare service modules* by treating them ... *as* a non-depreciable as-

---

22. *Carpenter*, 7 Cl.Ct. at 740–41 (distinguishing *IBM* on the basis that both taxpayers had made ruling requests whereas in *Carpenter* they had not); *Easter House v. United States*, 12 Cl.Ct. 476, 489–90 (1987) ("[T]axpayer cannot premise its right to an exemption by showing that others have been treated more generously, leniently or erroneously by IRS. The fact that there may be some taxpayers who have avoided paying a tax does not relieve others similarly situated from paying their taxes.")

set (*inventory*) without a determinable life, rather than to expense or depreciate the modules." Pl. Findings ¶ 30 (emphasis added).

While this court could find that plaintiff's proposed finding amounts to a stipulation that Diebold began to treat spare modules as inventory as early as 1974, this question still does not create an issue of material fact. Even if this factual dispute is genuine, it is immaterial for purposes of the current motion. The defendant is entitled to prevail as a matter of law even if, as plaintiff contends, 1976 was the first year in which Diebold conducted the activity.

Because the plaintiff had regularly employed inventory accounting from 1976–1979,[23] the Commissioner's consent was required prior to any change in methods. The plaintiff endeavors to establish that 1976, the alleged first year of the taxable activity, is currently before the court. Therefore, the plaintiff maintains, the court should treat its 1976 return as a "first return" that might be changed without consent. Had plaintiff sought to change its adoption of inventory accounting in an amended 1976 return filed on or before the deadline for filing the original 1976 return, such return would have been considered a "first" return. *Haggar Co. v. Helvering,* 308 U.S. 389, 395, 60 S.Ct. 337, 340, 84 L.Ed. 340 (1940); *Philadelphia Brewing Co. v. United States,* 89 Ct.Cl. 297, 27 F.Supp. 583 (1939). In general, however, once a taxpayer adopts an accounting method, and the deadline for filing the original return passes, the Commissioner is not obligated to accept a change of method in an amended return. *See, e.g., Pacific Nat'l,* 304 U.S. at 191, 58 S.Ct. at 857.

Nor is G.C.M. 38,680 of any assistance to the plaintiff. Even assuming that the plaintiff is correct that 1976 was the first year of the activity, the defendant is entitled to prevail as a matter of law because the plaintiff did not file an amended return for 1976 before the time for filing its 1977 return had expired. The parties have stipulated that plaintiff filed its amended 1976 return in 1980. Hence plaintiff cannot take advantage of the "first return" exception contained in G.C.M. 38,680.

The plaintiff's attempt to establish material factual disputes fails. The first year of the taxable activity is not material because the plaintiff clearly employed inventory treatment as a regular accounting method for several years before attempting to switch. Also, the correct tax treatment of the rotatable service modules is not material because the correctness of the new (original) method is no longer relevant under the prior consent rule of § 446(e).

### CONCLUSION

In the absence of a genuine issue of material fact, defendant is entitled to judgment as a matter of law. Accordingly, the court grants defendant's motion and directs the clerk to enter judgment for the United States and to dismiss the plaintiff's complaint.

---

23. *See supra,* note 7 and accompanying text.