CONVERGENT TECHNOLOGIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Convergent Technologies v. Commissioner
Docket No. 29655-91
United States Tax Court
T.C. Memo 1995-320; 1995 Tax Ct. Memo LEXIS 321; 70 T.C.M. (CCH) 87; July 19, 1995, Filed *321 Decision will be entered under Rule 155. For petitioner: Andre M. Saltoun, A Duane Webber, and Diane S. Rohleder. For respondent: Steven A. Wilson, Jeffrey L. Heinkel, and Michael F. Steiner. TANNENWALD
TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioner's 1982 and 1983 Federal income taxes in the amounts of $ 3,684,885 and $ 147,646, respectively. After concessions by the parties, we must determine whether warrants issued by petitioner to customers, in 1981, entitle petitioner to a reduction in gross income, or a deduction under section 162, [1] and whether petitioner, in an amended return, made a change in method of accounting without respondent's consent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying *322 exhibits are incorporated herein by this reference. Petitioner Convergent Technologies, Inc. (hereinafter referred to as CT or petitioner), is a corporation organized under the laws of California, with its principal office in Santa Clara, California, at the time the petition was filed. It timely filed U.S. corporate income tax returns for its taxable years ended December 31, 1981, December 31, 1982, December 31, 1983, and December 31, 1984, with the Internal Revenue Service Center, Fresno, California. For all relevant years, petitioner kept its books and records and filed its Federal income tax returns using the accrual method of accounting based on a taxable year ending December 31. Background
Throughout the relevant period, CT designed, developed, manufactured, and sold computer workstations and related systems and products, including integrated work stations, applications workstations, mass storage devices, communication interfaces, other computer hardware products, and related software. In 1981 and subsequent years, CT's primary strategic objective was to become a high volume manufacturer of computer workstations. The steps necessary to achieve this objective were to *323 become an indirect supplier to end users of products through original equipment manufacturer (OEM) customers, to complete the timely development of its initial set of products and thereafter develop new generations of innovative, state-of-the-art products ahead of the competition, and to rapidly develop a high volume manufacturing process that could produce high quality products in sufficient volume to meet the demand of its customers. There was a high degree of risk and uncertainty regarding CT's ability to accomplish each of these steps. The computer products industry in which CT competed was a highly competitive, volatile, fast developing and changing field in which the marketlife of technology was less than 24 months. In 1981, both CT and its products were unproven. CT's competitors were both other suppliers and the in-house departments of its OEM customers. Through 1983, CT sold computer workstations primarily to OEMs, systems houses, large end-users, and distributors. OEMs generally integrated products purchased from CT with additional applications software and peripheral equipment, sold the workstations under their own label, and provided customer training and service to *324 the end users of the workstations. In 1981, CT entered into OEM agreements with various customers, pursuant to which CT sold computer systems at volume discounts of up to 35 percent for annual purchases of 51 to 99 units, and greater individually negotiated volume discounts for annual purchases of 100 units or more. On May 18, 1982, CT made its initial public offering of CT common stock. CT and NCR
In 1981, the NCR Corporation (NCR) sought a supplier of computer workstations which were to be sold as NCR products. The workstation was to be sold by the Office Systems Division as the cornerstone in NCR's WorkSaver line of office automation products. NCR's primary concern in entering the workstation market was time to market. NCR felt its internal program was going to take too long to finish development of the necessary product. After consideration of various suppliers, NCR narrowed its focus on two suppliers, one of which was CT.
Ultimately, NCR selected CT based upon NCR's determination that the architecture of CT's computer workstations offered greater potential for speed and adaptation than the approach of the other system it was considering. Also, NCR was concerned about *325 the technical underpinnings of the other system. The biggest disadvantage of entering into an agreement with CT, according to NCR, was the small size of CT.
CT and NCR Negotiations
During the negotiations, NCR continually harped on the issue of discounts from CT.
In May or June of 1981, early in the negotiations of the product purchase agreement, NCR raised the idea of using a stock warrant in the transaction. NCR requested a stock warrant because NCR anticipated that its purchases of computer workstations from CT would contribute to CT's success, and NCR wanted to participate in the increase in the value of CT attributable to such purchases. NCR believed it would contribute to CT's success because of NCR's commitment of extensive resources to marketing and promoting the product line in its entirety, as well as because CT would gain credibility with other purchasers by signing a long-term purchase agreement with NCR, one of the largest computer companies in the world. NCR's desire to obtain the stock warrant was directly connected to NCR's purchase of products from CT and the hoped-for results from such purchases. It became NCR's negotiating position that it would not enter *326 into the purchase transaction without getting the stock warrant. CT's primary motivation for granting the stock warrant was to induce NCR to enter into the equipment purchase agreements, and ultimately to buy workstations. CT determined that, to avoid giving NCR a free ride, NCR would have to earn the warrants through the purchase of a significant volume of workstations. There was never any discussion of quantifying the value of the warrant as a discount, or of trading off the warrant for an amount of discount. CT and NCR Agreements
On August 25, 1981, CT and NCR entered into both an OEM agreement relating to NCR's purchase of computer workstations from CT (NCR agreement) and a warrant purchase agreement concerning the issuance of a stock warrant to NCR (NCR warrant). Under the terms of the NCR agreement, NCR was not required to purchase a minimum volume of workstations. Nor was NCR precluded from purchasing workstations from other suppliers. Under the terms of the NCR warrant, NCR had the right to purchase 250,000 shares of CT common stock at a price of $ 20 per share, which right was exercisable by NCR on or after the date on which NCR's cumulative dollar purchases from *327 CT exceeded $ 30 million within 4 years of the date of the agreement (August 25, 1985). After certain stock splits, the NCR stock warrant entitled NCR to purchase either 750,000 shares of CT common stock for a price of $ 6.47 per share, or 834,444 shares at $ 6.67 per share, on or after the date on which its cumulative dollar purchases from CT under the NCR agreement exceeded $ 30 million. Counsel for CT drafted the warrant agreement separately from the product purchase agreement in part because he was familiar with the format in loan and warrant transactions, and in part because CT wanted to be in a position to resist any attempt by NCR to get out of the product purchase agreement in the event that CT's stock did not increase in value. With respect to the latter reason, the warrant agreement had the following recital in the preamble: E. NCR understands and acknowledges that CT's willingness to grant NCR a warrant under the Agreement hereinafter set forth and to sell its common stock to NCR upon the exercise of the warrant does not constitute additional consideration by CT for NCR's purchase of CT's products under the OEM Agreement, and that this Agreement is entirely separate *328 and independent from the OEM Agreement.
The warrant was also drafted to meet certain securities law requirements for private placements. Despite the existence of these separate documents, the product purchases and stock warrant were parts of a single transaction, and NCR would not have been granted the stock warrant without the product purchase agreement. Exercise of the NCR Warrant
As NCR approached the minimum purchase level, it modestly accelerated the purchase of workstations to take advantage of the "very high level" at which CT's stock was trading, even though it anticipated some difficulty in selling the additional workstations because a successor product was due. On August 1, 1983, NCR's cumulative dollar purchases of CT's products reached $ 30 million, and the NCR stock warrant became exercisable. On August 1, 1983, the average fair market value of CT's common stock, as established by public trading on the NASDAQ national over-the-counter market, was $ 34.125 per share. Thus, on that date, the net fair market value of the warrant was $ 27.455 per share ($ 34.125 - $ 6.67), for a total of $ 22,909,660.00 ($ 27.455 per share x 834,444 shares). On August 30, *329 1983, NCR sold its rights to the NCR stock warrant to underwriters who simultaneously exercised the warrant, purchased 834,444 shares of CT common stock from CT for the exercise price, and sold the shares to the public. On August 30, 1983, the average fair market value of CT's common stock, as established by public trading on the NASDAQ national over-the- counter market, was $ 23.75 per share. Thus, on that date, the net fair market value of the warrant was $ 17.08 per share ($ 23.75 - $ 6.67), for a total of $ 14,252,304.00 ($ 17.08 per shares x 834,444 shares). CT and Burroughs
In 1981, the Burroughs Corp. (Burroughs), which was engaged primarily in the computer mainframe business, sought a supplier of computer workstations to be sold as Burroughs products. At the time, Burroughs realized that workstations were becoming important in the computer industry, and that Burroughs had lagged greatly in product development. Thus, Burroughs evaluated various alternative OEM suppliers. Burroughs chose CT as the company most likely to be able to provide the required product. Negotiations between Burroughs and CT took place at about the same time as the negotiations between NCR and CT.
*330 CT and Burroughs Negotiations
After CT learned of the idea of the warrant from NCR, CT approached Burroughs with the same idea. CT viewed the warrant as an inducement to Burroughs to enter into an OEM agreement, and then to make purchases once an agreement had been made. Burroughs saw the warrant as an opportunity to share in the wealth created if CT became successful due to the help of Burroughs. During the course of negotiations, Burroughs harped on the issue of additional discounts from CT, although a specific tradeoff of the warrant for an amount of sales discounts was never discussed. CT and Burroughs Agreements
On September 11, 1981, CT and Burroughs entered into an OEM agreement (Burroughs agreement) concerning the sale of computer workstations by CT to Burroughs. On September 22, 1981, CT and Burroughs entered into a warrant purchase agreement concerning the issuance of a stock warrant to Burroughs by CT (Burroughs warrant). The Burroughs agreement became effective only upon the execution by Burroughs of the Burroughs warrant. The Burroughs warrant and the NCR warrant are hereinafter occasionally referred to as the 1981 warrants. Under the terms of the Burroughs *331 agreement, Burroughs was required to purchase, from CT, a minimum of 5,000 workstations by December 31, 1982, and another 5,000 workstations between January 1 and December 31, 1983. Burroughs was free to purchase workstations from other suppliers. Under the terms of the Burroughs agreement, Burroughs was required to purchase, from CT, a minimum of 5,000 workstations by December 31, 1982, and another 5,000 workstations between January 1 and December 31, 1983. Burroughs was free to purchase workstations from other suppliers. Under the terms of the Burroughs warrant, Burroughs had the right to purchase 250,000 shares of CT common stock (referred to as "First Shares") at a price of $ 14 per share, which right was exercisable by Burroughs on or after the date on which the cumulative number of computer workstations purchased by Burroughs from CT exceeded 10,000 units. For every additional 5,000 workstations purchased by Burroughs, it had the right to purchase an additional 100,000 shares at a price of $ 20 per share. After certain stock splits, and amendments, the Burroughs stock warrant entitled Burroughs to purchase up to 750,000 of the First Shares for a price of $ 4.67 per share, *332 on or after the date on which the cumulative number of computer workstations purchased by Burroughs exceeded 10,000. A condition of the Burroughs warrant was that the vice chairman of Burroughs be elected a member of CT's board of directors. The initial draft of the Burroughs warrant was based directly upon the NCR warrant (or a draft thereof). Again, the warrant was in a second agreement because that format was convenient for CT and familiar to its counsel, and because CT's counsel was concerned about Burroughs' reneging on the product purchase agreement if CT's stock did not increase in value sufficiently. The Burroughs warrant contains the same language in Recital E as does the NCR warrant, supra p. 8, and for the same reasons. The warrant was also drafted with securities law issues in mind. Despite the existence of these separate agreements, the product purchases and stock warrant were parts of a single transaction, and Burroughs would not have been granted the stock warrant without the product purchase agreement. Exercise of the Burroughs Warrant
On December 31, 1982, Burroughs' cumulative purchases of workstations from CT reached 10,000 units, and the Burroughs *333 stock warrant became exercisable. On December 31, 1982, the average fair market value of CT's common stock, as established by public trading on the NASDAQ national over-the-counter market, was $ 33.3125 per share. Thus, on the date the Burroughs warrant became exercisable, the net fair market value of such warrant was $ 28.6425 per share ($ 33.3125 - $ 4.67), for a total of $ 21,481,875 ($ 28.6425 per share x 750,000 shares). On March 17, 1983, Burroughs sold its rights to the Burroughs stock warrant to underwriters who simultaneously exercised the warrant, purchased 750,000 shares of CT common stock from CT for the exercise price, and sold the CT shares to the public. On March 17, 1983, the average fair market value of CT's common stock, as established by public trading on the NASDAQ national over-the-counter market, was $ 27.50 per share. Thus, on that date, the net fair market value of the Burroughs warrant was $ 22.83 per share ($ 27.50 - $ 4.67), for a total of $ 17,122,500.00 ($ 22.83 per share x 750,000 shares). Nature of the Relationship Between CT and NCR and Burroughs
CT's ultimate objective in its dealings with NCR and Burroughs was to sell the most possible workstations. *334 This included not just the products available at the time the agreements were entered into, but successor products as well. CT did not use the warrants as a method of securing capital or a long-term equity investment from either NCR or Burroughs. NCR, in fact, had a corporate philosophy against making equity investments in suppliers. Burroughs recognized the investment potential in the warrant, but was basically concerned in sharing in an increase in value of CT, regardless of the means. Once the warrants became exercisable, neither NCR nor Burroughs had incentive to purchase more workstations by virtue of the warrants. The workstations were sold as NCR and Burroughs products respectively. Thus, CT relied on NCR and Burroughs to market the workstations to end-users, which included their ability to develop necessary software applications, and sales and support staffs capable of effectively covering the market. Neither the NCR nor Burroughs warrant was granted in exchange for technological information. Entering into the product purchase agreements created an awareness of CT in the industry, but would have benefited CT little if CT did not subsequently sell workstations to NCR and *335 Burroughs. At various times from 1981 to 1984, Burroughs considered alternatives to the workstations supplied by CT. When comparing costs, Burroughs gave a value to the warrants it held and considered such value as an offset to the cost of CT's product. Accounting Treatment of the Stock Warrants
In connection with petitioner's 1981 financial statements, it was determined by petitioner, with the concurrence of its independent auditors, Coopers & Lybrand (C&L), that the NCR and Burroughs warrants had a value described as "nominal", "immaterial", and "having no fair market value", but not zero. C&L did not pursue, with respect to the 1981 warrants, what the accounting treatment would have been if the warrants had more than nominal value. Investment bankers were not hired to value the 1981 warrants at that time. On petitioner's 1981 financial statements, there were no entries with respect to the NCR and Burroughs [2] warrants, and no particular accounting treatment was identified, although the warrants were described in the Notes to Consolidated Financial Statements. There were also no entries with respect to the 1981 warrants on petitioner's 1982 financial statements. *336 In 1983, when the NCR and Burroughs warrants were exercised, petitioner's common stock was credited with the amount of the proceeds and cash debited. Around the time petitioner granted more warrants in 1983, petitioner sought to determine their correct accounting treatment. In a letter dated October 7, 1983, C&L, for the first time, recommended an accounting treatment for the warrants, which was consistent with Accounting Principles Board Opinion No. 14, Accounting for Convertible Debt and Debt Issued with Stock Purchase Warrants (APBO No. 14). Following this recommendation, an investment bank was retained, which valued the warrants granted in 1983 at $ 2,324,000, on the date of their issuance. Warrants granted in 1984 were valued at $ 4,000,000. Consistent with this recommendation, on petitioner's 1983 financial statements, petitioner included in its stock equity the value of the 1983 warrants as well as a related deferred charge, net of amortization of $ 80,000. In the Notes to Consolidated Financial Statements it was explained: "The deferred charge is amortized to operations (as additional sales discount) as product is purchased by the customer." [3] A valuation and amortization *337 charge for the 1981 NCR and Burroughs warrants was not included in the 1983 return. Tax Treatment of the Stock Warrants
*338 Petitioner's tax returns for 1981, 1982, and 1983 did not reflect any treatment for the 1981 NCR and Burroughs warrants. [4] After the 1983 warrants were granted, the correct treatment of those warrants, for tax purposes, was first contemplated. By the time the 1983 return was filed, C&L had not yet finally determined what it thought was the correct tax treatment for any of the warrants it had granted. Nevertheless, the 1983 tax return reflects a deduction of $ 80,000 for the amortization of the warrants granted by petitioner in 1983. C&L still had not finally determined what it thought was the correct tax treatment for any of the warrants petitioner had granted by the time the 1984 tax return was filed. The 1984 tax return continued the 1983 treatment by including a deduction of $ 1,238,599 for amortization of warrants granted in 1983 and 1984. *339 On August 26, 1987, petitioner filed a Form 1139, Corporation Application for Tentative Refund, in which petitioner reflected a carryback of a net operating loss from 1986 to 1983 and 1985. Based on this Form 1139 and the carryback of petitioner's 1986 net operating loss, respondent tentatively allowed a refund of income tax to petitioner for 1983 in the amount of $ 6,538,359. On March 14, 1986, petitioner filed an Amended U.S. Corporation Income Tax Return, Form 1120X, for 1983 (amended 1983 return), in which it adjusted its total income (line 11 of Form 1120) for 1983 by subtracting $ 31,374,804, the value of the warrants at the time they were exercised by NCR and Burroughs in 1983. Petitioner also adjusted its total income by adding $ 80,000, the amount of the deduction previously taken for the amortization of the warrants granted in 1983, and requested a refund of income tax in the amount of $ 6,539,900. In a notice of deficiency dated September 25, 1991, respondent disallowed the deduction for amortization of warrants in the amount of $ 80,000, for the 1983 tax year. Respondent also disallowed the reduction of gross income of $ 31,374,804, claimed in petitioner's amended 1983 *340 return. In addition, respondent disallowed deductions of $ 21,481,875 and $ 22,909,660, for the 1982 and 1983 tax years, respectively, that petitioner had claimed in a protest to proposed adjustments dated July 26, 1989. These amounts represented the value of the NCR and Burroughs warrants at the times they became exercisable. OPINION Sales Discount or Allowance
The first issue for determination is the correct characterization of the 1981 warrants. Petitioner contends that the value of the warrants (the excess of the value of CT stock over the exercise price) constitutes a sales discount or allowance excludable from gross sales or, alternatively, an ordinary and necessary business expense deductible under section 162. Respondent contends that the warrants represented an investment in CT by NCR and Burroughs, so that the value of the warrants constitutes a capital item that is neither excludable from gross sales nor deductible under section 162. Petitioner has the burden of proof. Rule 142(a). Initially, we note that respondent has stipulated that she will not argue or assert that section 1032 precludes a reduction in gross income, or a deduction under section 162, of an *341 otherwise deductible expense merely because the expense was paid with stock. Cf. Duncan Industries, Inc. v. Commissioner, 73 T.C. 266, 282-283 (1979). Also, respondent has stipulated that she will not argue or assert that warrants are not property that can be the subject of a sales discount, or a deductible expense. See Hollywood Baseball Association v. Commissioner, 42 T.C. 234, 270- 271 (1964), affd. 352 F.2d 350 (9th Cir. 1965), vacated on other grounds 383 U.S. 824 (1966). In a recent and substantially similar case, Sun Microsystems, Inc. v. Commissioner, T.C. Memo. 1993-467, we found that the value of stock warrants, granted in association with the sale of computer workstations to an OEM purchaser, represented a sales discount or allowance from the supplier-taxpayer and not a capital item. Petitioner, of course, finds favorable comparisons with the facts and circumstances in Sun Microsystems, Inc., whereas respondent contends there are important distinctions. Sun Microsystems, Inc., being a memorandum opinion of this Court, *342 is not controlling precedent. Darby v. Commissioner, 97 T.C. 51, 67 (1991) (citing Newman v. Commissioner, 68 T.C. 494, 502 n.4 (1977)). However, given the substantial similarity of the factual foundation of this case and Sun Microsystems, Inc., there is no reason why we should not follow the same analytical approach that we utilized in Sun Microsystems, Inc.
First, we note that the parties do not disagree that the value of a stock warrant can represent a sales discount or allowance. Their dispute herein turns upon whether the NCR and Burroughs warrants had, as respondent contends, an overriding "investment aura" that precludes acceptance of petitioner's characterization of the value of the warrants as a discount or allowance. Second, the parties also do not disagree that a specified dollar amount at the inception of the purchase arrangement is not necessary: it is enough if a mechanism for establishing such an amount is specified in the arrangement. See Sun Microsystems, Inc. v. Commissioner, supra (citing Pittsburgh Milk Co. v. Commissioner, 26 T.C. 707 (1956), *343 and Max Sobel Wholesale Liquors v. Commissioner, 630 F.2d 670 (9th Cir. 1980), affg. 69 T.C. 477 (1977)). With respect to the two critical findings of fact in Sun Microsystems, Inc. v. Commissioner, supra, that the warrants were an incentive for the purchase of workstations and that the warrant holder did not intend to hold the underlying stock, both elements are present in the record before us. As to the latter element, both NCR and Burroughs sold the warrants to underwriters shortly after they became exercisable, and never owned CT stock itself, a factor which we considered significant in Sun Microsystems, Inc. v. Commissioner, supra. In this connection, we recognize that there is no stipulation of the parties herein, as there was in Sun Microsystems, Inc., that the holder of the warrants did not intend to purchase or hold the stock if the warrants became exercisable and had value. That fact was not determinative in Sun Microsystems, Inc., and whatever gap exists by virtue of the absence of such stipulation herein is filled by the other facts *344 and circumstances of record. Regarding the former element, petitioner argues that the warrants were used as an incentive to induce NCR and Burroughs to enter into the product purchase agreements, and then, once the agreement was entered into, to purchase workstations. Respondent agrees the warrants were used as an incentive with respect to the agreements, but argues their purpose was to induce NCR and Burroughs to make successful product lines based upon CT's products thereby enhancing the value of CT and implementing the investment aura by way of creating value in the warrants. We agree with petitioner. It simply cannot be denied that, once the threshold was met that earned NCR or Burroughs the right to buy stock, there was no longer incentive, by virtue of that warrant, to buy more product. Burroughs had an incentive to buy more product once it earned the first warrant, but only because it had another warrant to buy stock based on another threshold. Of course, it was petitioner's hope that NCR and Burroughs would continue to purchase workstations after they earned the warrants, but the 1981 warrants did not provide any further incentive. An examination of the terms of petitioner's *345 warrant agreements with NCR and Burroughs reinforces this analysis. First, to earn their respective warrants, NCR and Burroughs were required to make a significant purchase of workstations from petitioner. Second, the terms of the warrant agreements varied with the expected purchases. For example, the Burroughs warrant provided for a lower exercise price than the NCR warrant because Burroughs made a commitment to purchase 10,000 workstations, whereas NCR did not make a similar commitment. Respondent argues that petitioner's position should be rejected because, according to respondent, it is based upon a per se identification of incentive with a sales discount or allowance. In respondent's view, it is misleading to focus on the word "incentive", as petitioner does, instead of focusing on the relationship between the warrants and product price. To support her argument, respondent states: "The petitioner's isolation of the word, 'incentive', does not alleviate the holding in Sun Microsystems that the Sun warrants were an 'incentive' in that 'they represented a sales discount or allowance.'" We do not agree with respondent that Sun Microsystems, Inc. made incentive synonymous *346 with a sales discount or allowance. Rather, our statement that the warrants were used as incentive was a finding of fact which led to our holding that, under all the facts and circumstances, the warrants were sales discounts or allowances. Indeed, we think that petitioner's position herein goes no further than that. Further, we do not agree with respondent as to the necessity of a more direct relationship between the warrants and the purchase price of the workstations involved herein. We certainly did not intend to establish a standard for determination in Sun Microsystems, Inc. v. Commissioner, supra, by relying on stipulations and testimony that showed the parties had discussed a specific trade-off of a discount for the warrants. The absence of such discussion is certainly a material difference with Sun Microsystems, Inc., but we are not persuaded that it is determinative. The circumstances of the negotiations and the actual effect of the NCR and Burroughs warrants overcome this difference. First, the idea of using warrants was introduced early in the negotiations with both NCR and Burroughs. Thus, there never came a point at which warrants *347 could be offered to NCR or Burroughs to satisfy their demands for a greater discount; the warrants were already in the deal. Second, regardless of what was discussed, it cannot be denied that the warrants lowered the overall cost of purchasing workstations from petitioner. Another comparison to be made with Sun Microsystems, Inc. v. Commissioner, supra, is the format of the product purchase and warrant agreements. In Sun Microsystems, Inc., not only was the warrant not included in the product purchase agreement, but it was included in an investment agreement involving certain obviously capital transactions. However, we concluded that the form was chosen predominantly for securities law purposes and did not overcome the evidence relating the warrant to the product purchase agreement. The warrants herein are also in separate agreements, but they are alone in these agreements and thus not tainted by association with an investment element, as was the case in Sun Microsystems, Inc. Thus, in that respect, petitioner has less of a burden to overcome than did the taxpayer in Sun Microsystems, Inc., and this burden is clearly met by the evidence *348 of the relationship between the warrant and the product purchase agreements. Although the warrant agreements were done separately for securities law purposes, they were also separated to make it more difficult for NCR and Burroughs to refuse to carry out the purchase agreements on the basis that the warrant had not become valuable. This latter purpose serves to emphasize the relationship between the warrants and the purchases. We are satisfied that the totality of the facts and circumstances herein overcome the recitals of the warrant agreements that the warrant is "entirely separate and independent" from the OEM agreement and does not "constitute additional consideration" for the purchase of products. Respondent also argues that the warrants were no-risk speculative stakes in the future performance of CT. This, however, describes any warrant, and does not preclude a finding the warrants were used as sales discounts. Further, respondent argues that NCR and Burroughs added value to petitioner, and assumed risks, in exchange for which the warrants were granted. On the facts before us, we are not so persuaded. It is not established that merely entering into the agreements gave value *349 to CT. If NCR or Burroughs did not purchase workstations after entering into the agreements, CT would have experienced no direct financial benefit, and might even have suffered a loss of credibility if it had failed ultimately to sell workstations to NCR or Burroughs. Also, the resources committed by NCR and Burroughs did not benefit petitioner, except to the extent that it led to the sales of the workstations. In sum, respondent relies on elements that exist in any sales relationship. Based on the totality of facts and circumstances, including the testimony of officials from the three companies involved whom we saw and heard, the value of the NCR and Burroughs warrants represents a sales discount or allowance and should be excluded from the gross income of petitioner. In light of the foregoing, we need not address the thorny question of whether the value of the warrants would be deductible as an ordinary and necessary business expense under section 162. See Sun Microsystems, Inc. v. Commissioner, supra (citing Brizell v. Commissioner, 93 T.C. 151 (1989); 1 Bittker and Lokken, Federal Taxation of Income, Estates and *350 Gifts, sec. 20.3.2 (2d ed. 1989)); cf. T.J. Enterprises, Inc. v. Commissioner, 101 T.C. 581 (1993). Valuation of Warrants
We now turn to the question, not before us in Sun Microsystems, Inc. v. Commissioner, supra, whether the warrants are to be valued at the time exercised or exercisable. Petitioner and respondent agree this determination is governed by the "all events test". Section 1.461-1(a)(2), Income Tax Regs., provides that accrual method taxpayers should deduct an expense when: (1) "all the events have occurred which determine the fact of the liability", and (2) "the amount thereof can be determined with reasonable accuracy." See United States v. Hughes Properties, Inc., 476 U.S. 593 (1986). We agree with petitioner that once the warrants became exercisable, the fact of petitioner's liability became certain. As petitioner states, the only remaining procedures were "routine, clerical, and ministerial in nature". Considering the large amount of profit which would inure to NCR and Burroughs upon exercise of the warrants, there was very little question the warrants would be *351 exercised. See United States v. Hughes Properties, Inc., supra at 605-606; see also United States v. General Dynamics Corp., 481 U.S. 239, 244-245 (1987). However, we do not think that the value of petitioner's obligation could have been determined with reasonable accuracy on the date the warrants became exercisable. Petitioner argues that a value can be found, namely the difference between the market price of petitioner's stock on the date the warrant became exercisable and the price of the warrant. To be sure by the time the NCR and Burroughs warrants became exercisable, petitioner's stock was publicly traded on the NASDAQ national over-the-counter market. However, the value we are seeking is the actual cost to petitioner of issuing the stock upon the exercise of the warrants, and this value can only be determined on the date of exercise. See Commissioner v. Lo Bue, 351 U.S. 243, 249 (1956); Weigl v. Commissioner, 84 T.C. 1192, 1212-1217 (1985); cf. Simmonds Precision Products, Inc. v. Commissioner, 75 T.C. 103, 119-120 (1980). *352 Neither NCR nor Burroughs knew how much the cost of the workstations would be reduced, until they sold the warrants which we note was the date of exercise in this instance. In this connection, it is interesting to note that between the date the NCR warrant became exercisable and the date it was exercised, the value of petitioner's stock went from $ 27.455 per share to $ 17.08, and the value of the warrant decreased by a total of $ 8,657,356.00. With respect to the Burroughs warrant, between the date it became exercisable and the date it was exercised, the value of petitioner's stock went from $ 33.3125 per share to $ 22.83, and the value of the warrant decreased by a total of $ 4,359,375.00. In connection with the foregoing, it is interesting to note that the reverse situation existed in Sun Microsystems, Inc. v. Commissioner, supra, in that the value of the warrant in that case rose between the date it became exercisable and the date it was exercised. In sum, the NCR and Burroughs warrants should be valued on the dates they were exercised. Method of Accounting
Petitioner's amended 1983 return treated the warrants as a sales discount or *353 allowance in the amounts representing the difference between the exercise price and the value of CT stock on the exercise date. This treatment conforms to our decision herein as to the proper treatment of the warrants. However, we are still left with the question, also not present in Sun Microsystems, Inc., whether such treatment constitutes a change in method of accounting, for which petitioner did not obtain the consent of respondent. Sec. 446(e). Petitioner and respondent disagree on virtually every aspect of this issue. We briefly reiterate the relevant facts. In 1981, when the NCR and Burroughs warrants were issued, it was determined that they had a "nominal" value. Petitioner's 1981 and 1982 returns did not reflect treatment of the 1981 warrants by any method. On its 1983 return, petitioner first included an amortization expense with respect to the warrants issued in 1983, reflecting adoption of the principles of APBO No. 14. [5] On its 1984 return, petitioner included amortization expenses, as a reduction in gross sales, for warrants issued in 1983 and 1984. On March 14, 1986, petitioner filed an amended 1983 return in which it included in income the $ 80,000 expense previously *354 taken as a deduction and reduced its gross sales by the value of the 1981 warrants at the times they were exercised. In the notice of deficiency, respondent disallowed the treatment of the warrants in both the original and amended 1983 returns. Section 446(e) requires that "a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of *355 the Secretary." [6] A change in method of accounting includes a change in the treatment of any material item used in the overall plan of accounting for gross income or deductions. Sec. 1.446-1 (e)(2)(ii)(a), Income Tax Regs. A material item is any item that involves the proper time for the inclusion of the item in income or the taking of a deduction. Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. A change in method of accounting does not include adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction. Section 1.446-1 (e)(2)(ii)(b), Income Tax Regs. Initially, we note that each warrant issued by petitioner in relation to the sales of product was not a new item. [7] See Federated Dept. Stores, Inc. v. Commissioner, 51 T.C. 500, 513- 514 (1968), affd. 426 F.2d 417 (6th Cir. 1970); *356 Gertzman, Federal Tax Accounting, at 9-44 (1988). Such being the case, the parties do not disagree that the 1981 warrants as well as the 1983 and 1984 warrants should have been reported under the same method of accounting. The parties disagree as to the first year in which a method of accounting was used with respect to the 1981 warrants. Petitioner argues that the first year was 1983, because neither its 1981 nor 1982 return reflects any treatment of the warrants. Respondent contends that petitioner chose to follow the principles of APBO No. 14 in 1981 and explains that, because the 1981 warrants were valued at zero, no amortization expense was recorded *357 in 1981 or 1982. As evidence of such a choice, respondent relies on a letter dated May 23, 1984, from petitioner's counsel to the Securities and Exchange Commission, which stated: The Company's decision on the appropriate accounting treatment for its warrants to customers was first made in the fall of 1981 when warrants had been granted to customers in connection with the Company's first major sales agreements. Careful consideration was given at that time by the Company and C&L to the applicable accounting principles. After a thorough review of existing authority, it was determined that the principles of Accounting Principles Board Opinion No. 14 should govern. Those principles have been consistently followed subsequent to the initial determination of applicability with respect both to the warrants issued in 1981 and subsequent warrants issued in 1983. * * * The statements in this letter are not consistent with either the testimony of the members of petitioner's accounting firm, or with the October 7, 1983, letter from the accounting firm, in which an accounting treatment was recommended, seemingly for the first time. [8] More importantly, the statements concern petitioner's *358 financial accounting and not its tax accounting. It is well established that financial and tax accounting treatment may often diverge. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 542-544 (1979); Challenge Publications, Inc. v. Commissioner, 845 F.2d 1541, 1546 (9th Cir. 1988), affg. T.C. Memo. 1986-36. [9] Ultimately, we must focus on the 1981 and 1982 returns themselves, and they are consistent with either expensing or capitalization-amortization treatment.
Because 1983 is the first year in which any treatment was reported on petitioner's returns, *359 we conclude that it was the first year in which a method of accounting was adopted for tax purposes. See Gertzman, supra at 9-42 n.141; cf. Bayley v. Commissioner, 35 T.C. 288, 298 (1960); Thrift v. Commissioner, 15 T.C. 366, 372-373 (1950) (where nothing is reflected on returns, it is determined that no election was made to report gain on an installment basis). The next question is whether, having adopted the capitalization-amortization method of accounting in its original 1983 return, respondent's consent was required in order for petitioner to be allowed to adopt the expense treatment in its amended 1983 return. Petitioner argues that, as a matter of law, the tax treatment of the stock warrants is not a method of accounting, because the issue to be resolved involves the character of the warrants and not the timing of a deduction. Petitioner maintains that, if the timing of a deduction is involved, it is only an incidental consequence of the characterization. Respondent replies that the change from a capitalization and amortization treatment to expensing treatment impacts a material item, per section 1.446-1(e)(2)(ii)( *360 a), Income Tax Regs., because it involves the proper time for the taking of a deduction. The choice between these two methods is the allowance of all expenses in one year or amortization over several years. It therefore cannot be gainsaid that the difference between these two methods of accounting is one of timing since either method results in the same lifetime income. See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 510 (1989); Standard Oil Co. (Indiana) v. Commissioner77 T.C. 349, 383 (1981); Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 682 (1980); sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs. (a correction to require depreciation for a class of assets where the assets had consistently been treated as an expense involves the question of the proper timing of an item, and thus is to be treated as a change in method of accounting).[10]
*361 Clearly, the capitalization-amortization method adopted by petitioner was erroneous. On this basis, if respondent disallowed the treatment reflected in petitioner's amended 1983 return and were insisting that petitioner adhere to its original capitalization-amortization treatment, we would be faced with the question whether respondent's consent was required to change from an erroneous to a correct method of accounting -- a problem which, over the years, has defied definitive resolution although the more recent judicial pronouncements seem to have resolved the question in the affirmative. Pacific Enter. & Subs. v. Commissioner, 101 T.C. 1, 23 (1993); Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. at 511; see also United States v. Kleifgen, 557 F.2d 1293, 1297 n.9 (9th Cir. 1977) (citing Witte v. Commissioner, 513 F.2d 391 (D.C. Cir. 1975), revg. T.C. Memo. 1972-232); Diebold, Inc. v. United States, 16 Cl.Ct. 193, 200-203 (1989), affd. 891 F.2d 1579 (Fed. Cir. 1989) (court finds *362 support in statute, legislative history, and case law for proposition that consent is required even where changing from an improper method); Southern Pacific Transportation Co. v. Commissioner, 75 T.C. at 682 n.208 (recognizing divergence of views between Tax Court and several of the Courts of Appeals); Underhill v. Commissioner, 45 T.C. 489, 496-497 (1966); sec. 1.446-1(e)(2), Income Tax Regs. But see Complete Finance Corp. v. Commissioner, 80 T.C. 1062, 1072 n.8 (1983), affd. 766 F.2d 436 (10th Cir. 1985) (noting that we have "tended not to require consent" when changing from an improper inclusion of the item in income or the taking of the deduction).[11]
We find it unnecessary to resolve that question because *363 the instant case involves a significantly different situation. In all of the above-cited cases, respondent was seeking to hold the taxpayer to the method originally chosen. In the instant case, respondent has disallowed not only the method that we have held to be the correct one but the earlier erroneous method as well and advocates an entirely different treatment of the item. Under that treatment, respondent would not allow any deduction whether in one year or over a period of years. Under these circumstances, we think that respondent's action changes the focus of this case from one of timing, as respondent contends, to one of characterization of the item, as petitioner contends. Consequently, consent of respondent is not required. Sec. 1.446- 1(e)(2)(ii)(b) ("Also, a change in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction"); Schuster's Express, Inc. v. Commissioner, 66 T.C. 588 (1976), affd. without published opinion 562 F.2d 39 (2d Cir. 1977); Underhill v. Commissioner, supra; *364 Gertzman, supra at 9-47 to 9-50. Moreover, we think that when respondent does not seek to hold a taxpayer to a previously adopted method of accounting but rather seeks to impose another method in place of the one utilized by the taxpayer, the consent of respondent under section 446(e) is generally not required. This is the teaching of Silver Queen Motel v. Commissioner, 55 T.C. 1101 (1971), where the issue was the proper method of depreciation, an issue that was clearly one of timing. In that case, we upheld the taxpayer, who had erroneously adopted the double-declining-balance method of depreciation and had then sought to elect the 150-percent method, and rejected respondent's contention that the taxpayer was limited to using the straight-line method, because it had failed to obtain the required consent to use the 150-percent method. We reinforced this holding in Foley v. Commissioner, 56 T.C. 765 (1971), where we sustained the identical position taken by the taxpayer with respect to 16 depreciable items but upheld respondent with respect to 2 items as to which the taxpayer had originally adopted the straight-line *365 method of depreciation. We recognize that both Silver Queen and Foley involved a specific statutory election in respect of depreciation, but we are satisfied that the reasoning of those cases goes beyond their specific facts and can be applied herein. We also note that since petitioner herein first used the original but erroneous method of accounting in 1983 and that such use has been challenged herein by respondent, it can be argued that petitioner never had the opportunity regularly to use a method of accounting, as contemplated by section 446(e), although the time interval between the first use of the original method and the adoption of the new method as reflected on its 1983 amended return would be an element to be considered. Under such a rationale, the consent of respondent under section 446(e) might not be required. Foley v. Commissioner, supra; Silver Queen Motel v. Commissioner, supra at 1105 ("the notion of changes in accounting method necessarily implies that a new accounting method is being substituted for a previously regularly used accounting method."); see Mamula v. Commissioner, 346 F.2d 1016, 1018-1019 (9th Cir. 1965), *366 revg. 41 T.C. 572 (1964); Buddy Schoellkopf Products, Inc. v. Commissioner, 65 T.C. 640, 653 (1975); Diebold, Inc. v. United States, 16 Cl.Ct. 193, affd. 891 F.2d 1579 (Fed. Cir. 1989); Rev. Rul. 72-491, 1972-2 C.B. 104; see also Seago, Horvitz, and Linton, "When Is the Correction of an Error a Change in Taxpayer's Method of Accounting?", 73 J. Tax. 76 (1990). We hold that respondent's consent was not required in order for petitioner to be permitted to expense the stock warrants' spread as a sales discount or allowance in the year of exercise. To reflect our conclusions herein and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The accounting treatment adopted by Burroughs was to deduct the value of the warrants, as they were earned, from the purchase price of the inventory of workstations, and then recognize the lower cost as the workstations were sold.↩
3. In an advice memorandum dated July 6, 1984, the Office of the Chief Accountant of the Securities and Exchange Commission addressed the issue of the accounting treatment of the warrants issued by petitioner, and four other companies, to their customers. The memorandum stated that petitioner correctly treated the warrants as a "cost associated with inducing the customers to enter into the sales agreements." Subsequently, on July 18, 1984, the SEC issued Staff Accounting Bulletin No. 57 regarding the accounting treatment of warrants issued by petitioner to its customers. Following the determination therein, petitioner was required to periodically determine whether it was "probable" that its customers would make sufficient purchases to earn the warrants. If so, then it was determined that subsequent purchases should be charged with a pro rata allocation of the estimated ultimate cost of the warrants.↩
4. On April 15, 1985, petitioner filed a Form 1139, Corporation Application for Tentative Refund, in which petitioner reflected carryback of a net operating loss from 1984 to 1981 and 1982 and the carryback of certain income tax credits from 1984 to 1982 and 1983. Based on this Form 1139 and the carrybacks of petitioner's 1984 net operating loss and income tax credits, respondent tentatively allowed refunds of income tax to petitioner for 1981, 1982, and 1983 in the amounts of $ 153,919, $ 7,112,340, and $ 1,049,763, respectively.↩
5. Accounting Principles Board Opinion No. 14, Accounting for Convertible Debt and Debt Issued with Stock Purchase Warrants, as its name implies, addresses the treatment of warrants issued in association with debt. The opinion provides that detachable warrants issued in debt transactions are to be valued at the date of issuance and that their value is to be treated by the issuer as an additional interest expense. It was noted that the warrants generally allowed the issuer to obtain lower interest rates than otherwise might be available.↩
6. Consent can be requested by filing an application on Form 3115. Sec. 1.446-2(e)(3)(i), Income Tax Regs.↩
7. Sec. 446 applies not just to overall methods of accounting, such as the cash or accrual methods, but also applies to the accounting treatment of any item, such as "the accounting treatment prescribed for research and experimental expenditures, soil and water conservation expenditures, depreciation, net operating losses, etc." Sec. 1.446-1(a)(1), Income Tax Regs.↩
8. The person at C&L responsible for petitioner's tax returns for the years at issue testified that tax treatment of petitioner's warrants was not contemplated until after the 1983 warrants were issued, and that he was not even aware of the 1981 warrants until 1984.↩
9. See also Fidelity Associates, Inc. v. Commissioner, T.C. Memo. 1992-142↩.
10. See also Saline Sewer Co. v. Commissioner, T.C. Memo. 1992- 236↩.
11. See Coulter Electronics, Inc. v. Commissioner, T.C. Memo. 1990-186, affd. without published opinion 943 F.2d 1318↩ (11th Cir. 1991).